**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Richard A. STUBBS (92–4340); and**
**Richard P. Duffield, Jr. (92–4341),**
**Defendants–Appellants.**

Nos. 92–4340, 92–4341.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 19, 1993.

Decided Dec. 14, 1993.

Terry Lehmann, Office of the U.S. Atty., Cincinnati, OH (argued), Robyn Jones, Office of the U.S. Atty., Columbus, OH (briefed), for plaintiff-appellee.

Samuel H. Shamansky, Cassidy & Meeks, Columbus, OH (argued and briefed), for defendants-appellants.

Before KENNEDY, MILBURN, and GUY, Circuit Judges.

MILBURN, Circuit Judge.

Defendants Richard A. Stubbs and Richard P. Duffield, Jr., appeal their jury convictions as well as the sentences imposed thereon on charges arising out of the illegal importation of baby crocodiles into the United States. Stubbs was convicted of one count of aiding and abetting the possession of illegally imported baby crocodiles in violation of the Endangered Species Act, 16 U.S.C. § 1538(c)(1). Duffield was convicted of one count of aiding and abetting the possession of illegally imported baby crocodiles in violation of 16 U.S.C. §§ 1538(c)(1) and 1540(b)(1) and one count of facilitating the transportation, concealment, or sale of illegally imported crocodiles in violation of 18 U.S.C. § 545. On appeal, the issues are (1) whether sufficient evidence was presented at trial to support Stubbs' and Duffield's convictions, (2) whether the district court erred when it in-

creased Stubbs' and Duffield's offense levels by two levels pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2Q2.1(b)(1) based upon its conclusion that the baby crocodiles were imported into the United States for commercial purposes, (3) whether the district court erred when it increased Stubbs' and Duffield's offense levels by four levels pursuant to U.S.S.G. § 2Q2.1(b)(3)(B) based upon its conclusion that the 47 baby crocodiles which were imported into the United States involved a quantity of protected wildlife that was substantial in relation either to the overall population of the species or to a discrete subpopulation, and (4) whether the district court erred when it increased Stubbs' offense level by four levels under U.S.S.G. § 3B1.1(a) for being an organizer or leader of the criminal activity. For the reasons that follow, we affirm in part, reverse in part, and remand.

## I.

### A.

On April 9, 1992, a federal grand jury issued an indictment charging defendants Stubbs and Duffield with conspiracy to import 47 Nile and Dwarf crocodiles and to facilitate their concealment and transportation after importation in violation of 18 U.S.C. § 371 (Count 1). Defendants were also charged with aiding and abetting the possession of illegally imported crocodiles in violation of 16 U.S.C. §§ 1538(c)(1) and 1540(b)(1) and 18 U.S.C. § 2 (Count 4). In addition, Stubbs was charged with the illegal importation of the crocodiles from Nigeria in violation of 18 U.S.C. §§ 545 and 2 (Count 2); Duffield was charged with facilitating the transportation, concealment, or sale of illegally imported crocodiles in violation of 18 U.S.C. §§ 545 and 2 (Count 3).

A jury trial commenced on August 3, 1992. On August 6, 1992, the jury found Duffield guilty of the charges in counts 3 and 4 of the indictment; Stubbs was also found guilty of the charges in count 4 of the indictment. Stubbs and Duffield were acquitted of the charge in count 1 of the indictment, and Stubbs was also acquitted of the charge in count 2 of the indictment.

### B.

On Saturday, August 17, 1991, a Nigerian Airways flight transported a 50–carton shipment of "tropical fish" from Lagos, Nigeria, to J.F.K. International Airport in New York City. The consignor of the shipment was A.U.N. Nigeria, Ltd., of Lagos, and the consignee was Lombardo's African Imports of Newark, New Jersey. Shipments of wildlife are subject to inspection by the United States Fish and Wildlife Service.

Inspector Paul Cerniglia of the U.S. Fish and Wildlife Service was working at J.F.K. on this particular weekend and began inspecting the Nigerian Airways shipment. The paper work stated that the shipment consisted of live tropical fish. As he checked the boxes, Inspector Cerniglia heard sounds coming from some of the boxes and found that two of the boxes had air holes. He opened the boxes and found several bags full of land crabs. The bags of land crabs were sitting on a false bottom, a styrofoam shield. Underneath the styrofoam, Inspector Cerniglia found 11 bags containing 47 baby crocodiles. Inspector Cerniglia then called Special Agent Charles Bepler to investigate. Cerniglia inspected the remaining 48 cartons from the shipment but did not find any additional crocodiles.

Of the 47 baby crocodiles found by Inspector Cerniglia, 39 were African Dwarf crocodiles and 8 were Nile crocodiles. Because the crocodiles were on the endangered species list, were not properly invoiced and had not been properly declared on the accompanying paper work, and there were no permits for the legal importation of the crocodiles into the United States, Agent Bepler and Inspector Cerniglia decided to attempt a controlled delivery of the shipment to the individual noted on the cartons, Dr. Tej Singh. Bepler and Cerniglia enlisted the assistance of Lombardo's, the consignee. Ben Rosler, one of the owners of Lombardo's, advised the agents that Dr. Singh was to receive 8 boxes of tropical fish from the 50–carton shipment. Dr. Singh ordered the fish from defendant Stubbs, who was in Nigeria, and requested that his shipment be included as part of the shipment from A.U.N. to Lombardo's.

When the controlled delivery was made, Dr. Singh opened one of the boxes containing the crocodiles and looked "surprised" and then "stunned." J.A. 129. After seeing the crocodiles, Singh showed Rosler a fax which Singh had received from Stubbs in Nigeria. The fax was an invoice from A.U.N. Nigeria, Ltd, listing the tropical fish which were to be sent to Singh. The following message was at the bottom of the fax:

Doc: Singh:

Please get the 2 boxes of land crab and get it to S & S Urgent Fast!!

Please Fax them the Air Way Bill. If you do not get an answer from them: call Ricky [defendant Duffield] in New Orleans:

504 277 6394

Richard Stubbs

J.A. 335. At trial, Stubbs admitted sending the fax.

After showing Rosler the fax, Singh was given permission to use Lombardo's telephone to call Ricky [Duffield] in New Orleans. Singh told Duffield that he was angry that the shipment contained crocodiles and that he would have nothing to do with the shipment due to the lack of paper work. Duffield told Singh that he would call Stubbs. Dr. Singh also told Duffield that he thought customs officials had opened the boxes; Duffield wanted to know what customs officials had done or said.

During this conversation, Singh handed the receiver to Ben Rosler. Duffield told Rosler he was going to call Stubbs in Nigeria, and Rosler gave him Lombardo's telephone number. Shortly thereafter, Duffield telephoned Rosler. Duffield stated that he had talked to Stubbs and advised Rosler to send the crocodiles to S & S Imports in Columbus, Ohio.

After Duffield's call, Stubbs called Rosler from Nigeria. Stubbs told Rosler that he had been holding the crocodiles for five weeks and that either Tom Schultz or Duffield was to pick them up in New York but that had not worked out. Stubbs stated that he had been unable to get a free disposal license from Nigeria for the crocodiles but that he needed to ship them because he had

a customer for the crocodiles, Marc Weiss. Stubbs further stated that he needed to get someone to identify the species of the crocodiles. Additionally, Stubbs stated that he knew he did not have the paper work to ship the crocodiles but that he shipped them because they were getting thin. Stubbs asked Rosler to ship the crocodiles to S & S Imports at fax number 614–846–4519.

On August 18, 1991, Agent Bepler and Rosler shipped 45 of the crocodiles to S & S Imports in Columbus, Ohio, via Continental Airways. One crocodile of each of the two species was kept in New York as evidence. Agent Bepler also marked each of the 45 crocodiles with ultraviolet ink before shipping them. Before shipment, Rosler called "Jim" with S & S Imports and told him that the shipment of crocodiles was on its way.

On Sunday, August 18, 1991, two employees of S & S Imports ("S & S"), Jim Fracker and Tom Wilson, picked up the two cartons of land crabs and crocodiles at Port Columbus International Airport. Fracker and Wilson took the two cartons back to the offices of S & S, removed the crocodiles from the cartons, and placed them in tubs of water. Shortly thereafter, U.S. Customs Service and U.S. Fish and Wildlife Service agents executed search warrants at S & S' premises. They found the packing materials from the cartons and 43 living crocodiles.

At trial, both Wilson and Fracker, who had already pled guilty to aiding and abetting the possession of illegally imported crocodiles, admitted that they knew the boxes contained the crocodiles when they went to the airport to pick them up. Wilson testified that on the Wednesday before the shipment arrived Duffield told him that the shipment might possibly contain crocodiles. Duffield also told Wilson that the "crocs" could sell from $75 to $150 each.

Shortly before Duffield left Columbus for New Orleans, Duffield also told Fracker that the crocodiles might be coming from Nigeria. Fracker testified that Duffield called him on August 17, 1991, and told him that the crocodiles were being shipped and had come into the country without any paper work.

Fracker, Wilson, and Rhonda Reed, another S & S employee, testified that they understood that S & S was owned by Tom Schultz and Richard Stubbs. According to the three employees, Schultz ran the operation in Worthington, Ohio, while Stubbs lived in Nigeria and was responsible for shipments of wildlife from Nigeria to S & S. During the search at S & S premises, the agents found a partnership agreement, listing S & S as an Ohio corporation with Schultz owning 50 percent of the business and defendant Stubbs owning the other 50 percent.

In June or July of 1991, Stubbs returned to the United States and brought Duffield to S & S Imports. Apparently, Duffield was there to take over the computer and financial affairs of the business since Schultz was spending money and not paying the corporation's bills. Fracker testified that he considered Duffield to be his boss in Schultz's absence, since Schultz was never around. Dr. Singh also testified that it was his impression that Duffield was running S & S, or at least the financial end of it, in Schultz's absence. Duffield also had signature authority over S & S bank accounts.

Marc Weiss also testified at trial. According to Weiss, he contacted Thomas Schultz by telephone during the summer of 1991 to locate some crocodiles for a researcher in Canada. Weiss told Schultz that he needed some African slender snouted crocodiles, an endangered species, as a favor. Weiss told Schultz that obtaining the crocodiles would be a no-profit deal but that if Schultz obtained the crocodiles, Weiss would give him the names of some of his Asian associates who were very interested in obtaining African fish and that Schultz would stand to make quite a bit of money.

During the telephone conversation with Weiss, Schultz put Weiss on a conference call with Stubbs in Nigeria. Stubbs told Weiss he had baby crocodiles at his facility, that he was not certain of the species, but there were two kinds, Nile crocodiles and Dwarf Crocodiles. Stubbs agreed to help Weiss obtain crocodiles. Weiss stressed to Stubbs that the crocodiles had to be certain species, that he wanted two to six of each species and that those species required permits and all the necessary paper work before they were shipped.

Both Weiss and Stubbs testified that their telephone connection was bad. Weiss testified that he could remember the conversation. Stubbs testified that he could not remember the conversation very well and that he could not hear anything due to the bad connection.

Two weeks after the conference call, Schultz called Weiss and told him that they were proceeding with the crocodile deal. Schultz told Weiss that he would contact him when they had all the necessary paper work. Weiss testified that he had no other contact with Schultz.

Jim Fracker also testified that he recalled that when Stubbs was in the United States, Stubbs asked him if he could sell "legal-raised" crocodiles. Stubbs, however, testified that he did not recall talking to S & S employees when he was in Columbus.

Stubbs testified that he accepted half ownership in S & S because Schultz owed him a great deal of money from prior business dealings. Stubbs also testified that he brought Duffield into the business to look over his interests and to make certain that the bills were paid. Stubbs claimed that he spoke to a lawyer in Nigeria, who had a crocodile farm, about the crocodile deal but that he was not involved after that. Stubbs claimed he told the Nigerian lawyer to contact Schultz directly.

Stubbs testified that he did not know the crocodiles were in the land crab boxes and that all he did was handle the paper, and he did not pack the boxes. He testified that he believed the land crabs came from the same lawyer who had the crocodiles. Stubbs also denied that the conversation with Rosler took place as described by Rosler. Stubbs testified that he told Rosler he did not know about the crocodiles and that he told Rosler to ship the cartons to S & S so that Rosler would not get into trouble. Stubbs claimed that Rosler's company, Lombardo's, owed him a lot of money and that he had threatened to put Rosler's business into bankruptcy.

Further, after the parties stipulated that the 47 crocodiles in this case were 8 Nile crocodiles and 39 Dwarf crocodiles, the district court took judicial notice that both species were on the endangered species list pursuant to 50 C.F.R. § 17.11, the regulations under the Endangered Species Act. Inspector Cerniglia of the Fish and Wildlife Service testified that to legally import an endangered species into the United States, the importer must obtain an export permit from the country of origin of the species as well as an import permit from the United States. According to Cerniglia, import permits for endangered species are issued only under very special circumstances, such as for breeding programs conducted by scientific research institutes or zoos which are attempting to sustain the existence of the particular species.

In addition, a regulatory system known as the Convention on International Trade and Endangered Species ("CITES") monitors the trade in wildlife, both flora and fauna, passing through one member country to another. The United States and Nigeria have been members of CITES since 1975. CITES Appendix I species require both import and export permits as they are considered species threatened for possible extinction. CITES Appendix II species require an export permit from the country of origin. The Nile and Dwarf crocodiles, when originating in Nigeria, are Appendix I species. Nile and Dwarf crocodiles are Appendix II species if they are raised on a farm for captive breeding which is registered with CITES. Other African countries raise crocodiles for food and skins; however, Nigeria has no captive breeding farms registered with CITES. Thus, both import and export permits are required under CITES Appendix I species for Nile and Dwarf crocodiles native to Nigeria. These permits cannot be obtained for commercial purposes but only for scientific purposes to benefit the remaining members of the species in the wild. Moreover, if species such as the Nile and Dwarf crocodiles are listed as endangered species in the regulations promulgated pursuant to the Endangered Species Act, they would not be allowed into the United States without an additional special permit beyond that required by CITES.

The parties stipulated that there were no export or import permits in the names of Richard Stubbs, Thomas Schultz, Richard Duffield, S & S, A.U.N. Nigeria, Global Exports, or Lombardo's for the August 17, 1991, shipment which contained the two cartons in which the 47 crocodiles were hidden.

Stubbs and Duffield were sentenced on November 30, 1992. Although the sentencing range for Stubbs was 21 to 27 months, Stubbs was sentenced to 12 months imprisonment to be followed by one year of supervised release and a $5,000 fine, because the offense of which he was convicted was a misdemeanor carrying a maximum possible sentence of one year. Duffield was sentenced to 14 months imprisonment to be followed by three years of supervised release on Count 3 and 12 months of imprisonment to be followed by one year of supervised release on Count 4, such sentence to be served concurrently to the sentence on Count 3. However, under U.S.S.G. § 5C1.1(c)(3) and (d)(2), the district court exercised its option of requiring Duffield to serve seven months of his sentence in a penal institution, with the remaining seven months to be served by home detention. This timely appeal followed.

## II.

### A.

Defendants Duffield and Stubbs argue that there was insufficient evidence to support their convictions. This court reviews a challenge to the sufficiency of the evidence to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Perry,* 991 F.2d 304, 307 (6th Cir. 1993) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

Duffield challenges the sufficiency of the evidence supporting his convictions under 16 U.S.C. § 1538(c)(1) and 18 U.S.C. § 545.

Duffield asserts that the majority of the evidence presented against him was the testimony of Fracker and Wilson, both of whom testified against him in exchange for promises of leniency from the government. Duffield further asserts that given Wilson's and Fracker's relationship with the government, their testimony is "suspect at best." Appellant's Brief [Duffield] 16. However, "attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence." *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir.1984), *cert. denied*, 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985). Thus, Duffield's challenge to the sufficiency of the evidence is meritless.

■ Stubbs also challenges the sufficiency of the evidence supporting his conviction under 16 U.S.C. § 1538(c)(1). Stubbs argues that there was no evidence presented by the government establishing that he knowingly aided and abetted any person with the illegal possession of the crocodiles. Stubbs asserts that he had no knowledge that the crocodiles were being shipped.

However, the evidence presented at trial showed that Stubbs' assertion that he did not know the crocodiles were being shipped was untrue. The ultimate destination of the crocodiles was S & S in which Stubbs was a 50 percent partner. Moreover, as early as the Wednesday before the Saturday shipment of the crocodiles, Duffield told the other employees of S & S, Fracker, Wilson and Reed, that the crocodiles might possibly be coming. Since Stubbs was the only person connected with S & S in Nigeria, Duffield could only have learned this from Stubbs. Further, Stubbs had brought Duffield into S & S to protect Stubbs' financial interest. Moreover, the night before the shipment of the crocodiles, Stubbs sent a fax to Dr. Singh telling Singh to send the two boxes of land crabs in which the crocodiles were hidden to S & S. The fax told Dr. Singh to do so urgently. Further, after Singh called Duffield about the crocodiles and Duffield indicated he would have to speak to Stubbs, Stubbs called and spoke to Ben Rosler who was also present. Stubbs told Rosler that he had been holding the crocodiles for five weeks and that

he should have held off shipping the crocodiles because he lacked the necessary paper work, but the crocodiles were getting thin. Finally, the jury evidently rejected Stubbs' testimony that he did not know anything about the shipment of the crocodiles until they arrived in New York, and he only told Rosler to ship them to S & S so that Rosler would not get into trouble. Therefore, Stubbs' assertion that there was no evidence from which a rational juror could find that he knew the crocodiles were being shipped is meritless.

**B.**

Both Stubbs and Duffield argue that the district court erred in increasing their offense levels by four levels under U.S.S.G. § 2Q2.1(b)(3)(B) based upon its finding that the 47 crocodiles involved in this case were significant in relation to the overall populations of the species. Specifically, defendants argue that the district court's findings were clearly erroneous because the government presented absolutely no evidence regarding the size of the population of Dwarf crocodiles in existence and because the government's exhibits show that Nile crocodiles are commercially raised in four African countries at an approximate rate of 32,000 per year.

■ Under 18 U.S.C. § 3742, this court reviews de novo a sentencing court's interpretation of the guidelines, but the court must uphold a sentencing court's factual findings unless they are clearly erroneous. *United States v. Ivery*, 999 F.2d 1043, 1045 (6th Cir.1993) (citing *United States v. Morrison*, 983 F.2d 730 (6th Cir.1993)). The sentencing court's factual findings need only be supported by a preponderance of the evidence. *Id.* However, where the applicability of an enhancement provision is in question, the government bears the burden of establishing by a preponderance of the evidence that the enhancement factors apply. *United States v. Medina*, 992 F.2d 573, 592 (6th Cir.1993), *petition for cert. filed*, 62 U.S.L.W. 3321 (U.S. Oct. 18, 1993) (No. 93–607). Finally, this court must "give due regard to the opportunity of the district court to judge the credibility of the witnesses." *United States v. Perez*, 871 F.2d 45, 47 (6th

Cir.) (quoting 18 U.S.C. § 3742(d)), *cert. denied*, 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989).

 At the time defendants were convicted the specific offense characteristics of U.S.S.G. § 2Q2.1(b)(3)(B) stated:

> If the offense involved a quantity of fish, wildlife, or plants that was substantial in relation either to the overall population of the species or to a discrete subpopulation, increase by 4 levels.

U.S.S.G. § 2Q2.1 (1991). However, at the time of defendant's sentencing, a new version of the guidelines had taken effect; in this version U.S.S.G. § 2Q2.1(b)(3)(B) states:

> If the offense involved (i) marine mammals that are listed as depleted under the Marine Mammal Protection Act (as set forth in 50 C.F.R. § 216.15); (ii) fish, wildlife, or plants that are listed as endangered or threatened by the Endangered Species Act (as set forth in 50 C.F.R. Part 17); or (iii) fish, wildlife, or plants that are listed in Appendix I to the Convention on International Trade in Endangered Species of Wild Fauna or Flora (as set forth in 50 C.F.R. Part 23), increase by four levels.

U.S.S.G. § 2Q2.1 (1992). U.S.S.G.App.C. n. 452 (1992) discusses the amendments to U.S.S.G. § 2Q2.1, stating in relevant part that "the amendment modifies the specific offense characteristic in subsection (b)(3) [U.S.S.G. § 2Q2.1(b)(3) ] to better encompass the types of cases that the Commission intended to cover."

At sentencing, defendants called as a witness the United States Probation Officer who had prepared the presentence investigation reports for both Stubbs and Duffield and had recommended that the four-level upward enhancement of U.S.S.G. § 2Q2.1(b)(3)(B) be applied to both defendants. Not surprisingly, the probation officer admitted that he did not know how many Nile crocodiles or Dwarf crocodiles were in existence in Nigeria. However, the probation officer testified that his recommendation that the four-level enhancement be applied was based upon the fact that Nile and Dwarf crocodiles are listed as endangered species and upon the modifications to the guidelines. Agent Pierce of the U.S. Fish and Wildlife Service also testified at sentencing that Nile and Dwarf crocodiles are listed as endangered species under the Endangered Species Act and are listed on CITES Appendix I. Agent Pierce further testified that although other African nations commercially breed Nile crocodiles, Nigeria does not. Thereafter, the district court found that since Nile and Dwarf crocodiles are endangered species, at least in Nigeria, the government had met its burden of establishing the factors leading to the enhancement under U.S.S.G. § 2Q2.1(b)(3)(B) by a preponderance of the evidence.

Defendants, relying on the case of *United States v. Hung Van Tran*, 955 F.2d 288 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992), argue that district court's conclusion that the government had met its burden was clearly erroneous because the government presented no evidence concerning the populations of the Nile and Dwarf crocodiles. In *Tran*, the government presented expert evidence that the Kemp's ridley sea turtle, the wildlife involved in that case, was almost "biologically extinct." *Id.* at 290. However, the Fifth Circuit stated that "endangered species population estimates are approximate, if estimates even exist. . . . [W]e see no practical reason to require evidence of an overall population estimate. Rather, we believe that such a requirement could effectively nullify the guideline enhancement. And no authority so compels or counsels." *Id.* at 290–91. Finally, the Fifth Circuit, interpreting the decision in *United States v. Asper*, 753 F.Supp. 1260 (M.D.Pa.1990), *aff'd*, 941 F.2d 1203 (3d Cir. 1991), stated that "We read *Asper* to simply confirm that estimates of total population size, when estimates exist, may be a factor for the district court to consider." *Tran*, 955 F.2d at 291.

In this case, absolutely no evidence was presented to the district court showing that the 39 African Dwarf crocodiles and 8 Nile crocodiles were either substantial in relation to the overall populations of the species or to discrete subpopulations of the species. The government argues, relying on this court's decisions in *United States v. Luster*, 889 F.2d 1523, 1529 (6th Cir.1989), and *United States*

*v. Smith,* 887 F.2d 104, 107–08 (6th Cir.1989), that the district court could base its sentencing enhancement upon the modification to U.S.S.G. § 2Q2.1 because it was a clarification and not an amendment to that section of the guidelines. However, we reject this argument. Unlike the amendment in *Smith* which stated that the "amendments merely 'clariff[ied]' the intent underlying [the guidelines] as originally promulgated,'" *Smith,* 887 F.2d 104, the commentary to the guideline amendment in this case does not state that the amendment was for purposes of clarification. Rather, the commentary states that the amendment was made to better encompass the kind of situations which the commission intended to cover. Thus, the modification to U.S.S.G. § 2Q2.1 altered the coverage of subsection 2Q2.1(b)(3)(B).

Accordingly, we conclude that the district court improperly applied the four-level enhancement of U.S.S.G. § 2Q2.1(b)(3)(B), because a preponderance of the evidence does not support the district court's enhancement of Stubbs' and Duffield's sentences.

### C.

■ Defendants Stubbs and Duffield argue that the district court's finding that their importation of the crocodiles was for commercial purposes was not based upon a preponderance of the evidence and was clearly erroneous. U.S.S.G. § 2Q2.1(b)(1) (1991) states, "If the offense involved a commercial purpose, increase by 2 levels." Duffield asserts that the district court's finding is clearly erroneous because the district court did not set forth detailed findings regarding this issue. Stubbs asserts that he did not act with a commercial purpose because his testimony at trial clearly established that he told Ben Rosler to ship the crocodiles to S & S in order to spare Lombardo's any problems with the shipment of undocumented crocodiles.

As noted previously, a sentencing court's factual findings are reviewed for clear error and must be supported by a preponderance of the evidence. *United States v. Ivery,* 999 F.2d 1043, 1045 (6th Cir.1993). At sentencing, the district court stated, in relevant part:

I do think there has been proof by a preponderance of the evidence that the importation of these crocodiles was for a commercial purpose. I do recall the testimony of Mr. Weiss that he was seeking crocodiles for sale to nonprofit institutions in the United States and Canada, ... and it does seem to me that there was a specific name of an Institute mentioned in Canada in the trial testimony.

There was also discussion between Mr. Stubbs and employees at S & S Imports concerning possible sale price of the crocodiles. So I think there is ample testimony that these were involved in commercial purpose.

J.A. 292–93, 320–21. These findings applied to both Stubbs and Duffield.

In this case, there was ample evidence adduced at trial to support the district court's findings by a preponderance of the evidence. First, when Marc Weiss spoke to Stubbs' partner, Schultz, about obtaining crocodiles, Weiss promised Schultz that S & S could make quite a bit of money out of the deal because Weiss would provide S & S with the names of Asian buyers who were interested in African tropical fish. Schultz then called Stubbs in Nigeria for a conference call with Weiss.

Second, Stubbs returned to the United States to install his man, Duffield, at S & S to take care of the financial end of the business. During this visit to S & S, Stubbs allegedly asked one of the employees, Jim Fracker, whether Fracker could obtain customers for crocodiles. Finally, just before the shipment of crocodiles arrived in August, Duffield had a discussion with another S & S employee, Tom Wilson, concerning the possible shipment of crocodiles. During this discussion, Duffield told Wilson that the crocodiles could sell for $75 to $150 each. Based upon this evidence, the district court's conclusion that the importation of the crocodiles was for a commercial purpose is not clearly erroneous and is supported by a preponderance of the evidence.

### D.

■ Defendant Stubbs argues that the district court's finding that he was an orga-

nizer or leader of a criminal activity that involved five or more persons was clearly erroneous. Therefore, he asserts that the district court's enhancement of his offense level by four levels under U.S.S.G. § 3B1.1(a) must be reversed. Specifically, Stubbs argues that because the probation officer who prepared the presentence investigation report could not identify the five participants in the criminal activity which Stubbs was alleged to have organized, the district court's finding is clear error.

Again, the district court's factual findings are reviewed for clear error, and the findings must be supported by a preponderance of the evidence. *Ivery,* 999 F.2d at 1045. U.S.S.G. § 3B1.1(a) states: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." The commentary to that section states: "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1, comment. (n. 2).

However, the district court failed to make a finding as to the identity of the five persons involved in the criminal activity. In the absence of specific findings by the district court, any conclusion as to the identity of the five participants is pure speculation. We conclude that in considering the applicability of the enhancement under U.S.S.G. § 3B1.1, the district court must make specific findings as to the identity of the persons involved in the criminal enterprise. Accordingly, we reverse the district court's enhancement of Stubbs' sentence under U.S.S.G. § 3B1.1(a), and remand for further findings as to the identity of the persons involved in the criminal enterprise.

### III.

For the reasons stated, Stubbs' and Duffield's convictions are AFFIRMED, and the district court's enhancements of Stubbs' and Duffield's sentences under U.S.S.G. § 2Q2.1(b)(1) are also AFFIRMED. However, the district court's enhancements of Stubbs' and Duffield's sentences under U.S.S.G. § 2Q2.1(b)(3)(B) are REVERSED, and the district court's enhancement of Stubbs' sentence under U.S.S.G. § 3B1.1 is likewise REVERSED. Accordingly, this case is REMANDED for further proceedings consistent with this opinion.