**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Reda GHAZALEH, Defendant–Appellant.**

**No. 94–5001.**

United States Court of Appeals,
Sixth Circuit.

Argued May 11, 1995.

Decided June 23, 1995.

James E. Arehart, Asst. U.S. Atty. (argued), Mark A. Wohlander, Asst. U.S. Atty. (briefed), Lexington, KY, for plaintiff-appellee.

Allen E. Shoenberger (argued and briefed), Chicago, IL, for defendant-appellant.

Before: KENNEDY and NORRIS, Circuit Judges; WEBER, District Judge.*

KENNEDY, Circuit Judge.

A jury convicted defendant, Reda Ghazaleh, of conspiracy to possess cocaine and marijuana with the intent to distribute, a violation of 21 U.S.C. §§ 841(a)(1) and 846. Defendant now appeals, raising several assignments of error: whether the District Court erred by denying his motion to sever his trial from that of his co-defendant, whether the District Court erred by not giving a multiple conspiracy charge, whether the closing arguments of the prosecutor and the co-defendant were unduly inflammatory, and whether the District Court erred in assigning defendant a four-level sentence enhancement for being a leader of the conspiracy. We affirm.

**I.**

On June 17, 1993, a grand jury in Lexington, Kentucky indicted Reda Ghazaleh, Maz-

---

* The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

en Shunnarah, Osama Shalash, Milad Abushanab, and seven others on charges of conspiring to possess both cocaine and marijuana with the intent to distribute. The indictment alleged that the conspiracy was in operation from the summer of 1990 until the end of May 1993.

The Lexington DEA Task Force began investigating the conspiracy on March 24, 1992, after several informants reported that defendant, Shunnarah, and others were distributing multi-kilogram quantities of cocaine in Lexington, Kentucky. At trial, the government relied on the testimony of several of the co-conspirators to establish the events that occurred prior to the start of the investigation.

Shunnarah testified that he began selling cocaine and marijuana to defendant in the summer of 1990. Shunnarah estimated that he distributed approximately forty to sixty pounds of marijuana and twenty to thirty kilograms of cocaine to defendant over the course of the conspiracy. According to Shunnarah, he and defendant each paid $10,-000 towards the purchase of a farm in Kentucky. Also, in November 1991, the two men purchased a restaurant and bar in Lexington. Both purchases were financed at least in part with drug money. Shunnarah also testified that he began supplying cocaine to Shalash in January 1992 and ceased supplying defendant in January 1993. Shunnarah said that defendant wanted to deal only in large quantities of cocaine, so he gave many of his street level customers to Shalash. Shunnarah also stated that defendant told him that defendant was getting his cocaine from Abushanab after January 1993.

Shalash also testified concerning his involvement with defendant. According to Shalash, he began purchasing cocaine from defendant in the summer of 1990 and began selling it at that time. Shalash estimated that he purchased approximately thirty kilograms of cocaine and fifteen to twenty pounds of marijuana from defendant over the course of the conspiracy. He also stated that Shunnarah and defendant were the main sources of cocaine in Lexington during the period of the conspiracy.

Gwen Perkins, Shalash's girlfriend, also testified at trial. She stated that she began dating Shalash in October 1990 and began selling cocaine shortly thereafter. Perkins testified that she began obtaining her cocaine from defendant (through Shalash) after Shalash told her that defendant offered a better price than her supplier. Perkins also testified that, sometime in 1991, she and Shalash met defendant for lunch at a restaurant called T.W. Lee's. After they left the restaurant, defendant took a package out of his car and placed it on the floor of the back seat of Shalash's car, in which Perkins was a passenger. Perkins stated that she took the package home and found that it contained one-half kilogram of cocaine.

During their investigation, which began in March of 1992, agents obtained a wire intercept on the restaurant's phone. Between April 8 and May 27, 1993, the agents recorded 130 calls that were deemed to be drug related. Agents also developed information indicating that defendant was conspiring with Abushanab to purchase cocaine and marijuana from a Customs Service informant in Tampa, Florida. Special Agent Luis Mozas of the Customs Service testified that he became involved in an investigation of Abushanab on July 22, 1992, when a confidential informant reported that Abushanab was interested in purchasing five to ten kilograms of cocaine and approximately 200 pounds of marijuana. Mozas, who posed as a drug smuggler, and Sanabria (the informant) entered into negotiations with Abushanab over the telephone.

On August 4, 1992, Abushanab traveled to Tampa and met with Sanabria and Mozas. Abushanab advised them that he was interested in purchasing the drugs for his cousin Randy, who had a market for the drugs through grocery stores in black neighborhoods in Lexington. Abushanab offered $20,000 in cash, a commercial property worth $170,000, and a 27–foot Sea Ray boat as collateral. The boat belonged to Randy, who was later identified as defendant.

On August 6, Sanabria and Abushanab flew to Lexington to finalize arrangements. The two men drove to defendant's restaurant, where Sanabria met defendant. Dur-

ing the discussion, the three men talked about the exchange of the boat. They attempted to rent a truck to tow the boat to Florida, but were unable to find the appropriate type of trailer hitch. The next day, August 7, Abushanab and Sanabria left Lexington by plane. Negotiations continued until August 17. During that time, Abushanab and Mozas discussed the delivery of the cocaine and talked about an air drop on a farm in Kentucky owned by defendant. Mozas also discovered that the DEA Task Force in Lexington was operating a parallel investigation and agreed to postpone further negotiations so as not to interfere with the Task Force's investigation.

On May 28, 1993, Task Force officers executed a search warrant at defendant's residence and also at an unoccupied residence rented by defendant. The searches discovered two pistols, one revolver, one rifle, a pager, an ESI scale, $1700 in cash, and 31.2 grams of marijuana. Defendant was arrested and charged with conspiracy to possess marijuana and cocaine with intent to distribute. After trial, a jury found him guilty, and he now appeals.

## II.

### A. Severance

█ Defendant did not move for severance until after his co-defendant's opening argument, which was delivered nine days into the trial and after defendant had presented most of his evidence. In presenting his defense, defendant contended that he was innocent of the charges against him and attempted to provide innocent explanations for the evidence against him. His co-defendant Abushanab, however, conceded that he had committed the acts of which he was accused, but argued that he was acting as a government informant and therefore did not have the requisite culpability. Defendant contends that, until Abushanab's opening statement, he was unaware of Abushanab's defense and did not realize the extent to which Abushanab would provide testimony implicating defendant. Defendant argues that the government's case was weak and that it was Abushanab's evidence that "put the nail in his coffin."

The Federal Rules of Criminal Procedure provide that

> [i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires....

FED.R.CRIM.P. 14. The Rules also require that such a motion must be made prior to trial, FED.R.CRIM.P. 12(b)(5), and that failure to timely move for severance constitutes a waiver of the issue unless the defendant can show good cause for his failure. FED. R.CRIM.P. 12(f); *United States v. Garcia,* 20 F.3d 670, 673 (6th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1120, 130 L.Ed.2d 1083 (1995).

The first question before us, then, is whether defendant timely moved for severance. We conclude he did not. His first motion for severance came well into trial, after his co-defendant's opening statement. Consequently, we must look to whether he has shown good cause for his failure. This search requires us to evaluate whether he was unduly surprised by Abushanab's opening statement. As the government points out, Abushanab did not "ambush" defendant with his defense. Rather, Abushanab put everyone on notice of his defense on August 2, 1993, when he filed his "Notice of Defense Based Upon Public Authority." Trial did not begin until over a month later, on September 8. Defendant had plenty of time to prepare his case and decide the best strategy for handling Abushanab's defense. Defendant might not have known the extent of Abushanab's incriminating testimony, but he cannot say that he was ambushed.

As a second proffered grounds to excuse his failure to make a timely severance motion, defendant points to the fact that Abushanab did make such a motion, which the trial court denied. Abushanab's motion is not sufficient to place the issue of defendant's rights before the trial court. Thus, it appears that defendant has waived the issue of severance and cannot raise it on appeal.

■ Even if we were to address the merits of defendant's assignment of error, it is clear that the District Court did not abuse its discretion in denying defendant's mid-trial motion. *See United States v. Lloyd,* 10 F.3d 1197, 1215 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1569, 128 L.Ed.2d 213 (1994). Defendant's primary reason for seeking severance is that his and Abushanab's defenses were antagonistic. Under Rule 14, a defendant must show that he will be prejudiced by a joint trial, and, as the Supreme Court has declared, "[m]utually antagonistic defenses are not prejudicial *per se.*" *Zafiro v. United States,* —— U.S. ——, ——, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* The Court went on to state:

> [I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials.... While "[a]n important element of a fair trial is that a jury consider *only* relevant and competent evidence bearing on the issue of guilt or innocence," ... a fair trial does not include the right to exclude relevant and competent evidence. A defendant normally would not be entitled to exclude the testimony of a former codefendant if the district court did sever their trials, and we see no reason why relevant and competent evidence would be prejudicial merely because the witness is also a codefendant.

*Id.* This quotation aptly describes the present case. Abushanab's testimony was not admissible only because he was defendant's co-defendant; rather, the testimony would be admissible against defendant even in a separate trial. We do not see how defendant was therefore prejudiced because it was presented in a joint trial. While we concede Abushanab's testimony does make defendant look bad, that is in part due to the strategy chosen by defendant and his attorney—a strategy that was chosen in the face of Abushanab's announced intention to claim that he was acting as a government infor-

mant. Accordingly, the District Court did not err in denying the motion for severance.

## B. Jury Instructions

The indictment in this case charges defendant and ten others with conspiring to possess cocaine and marijuana with the intent to distribute. Defendant contends that the evidence showed that two conspiracies existed: the Chicago–Lexington conspiracy and the Tampa–Lexington conspiracy. He thus argues that the District Court should have given a multiple conspiracy instruction.

■ We first note that defendant did not move for a multiple conspiracy instruction at trial, as required by Federal Rule of Criminal Procedure 30. Consequently, the government argues that we should review only for plain error. Defendant replies by pointing out that the issue was before the District Court, as Abushanab had made the pertinent motion. In considering Abushanab's motion the District Court stated:

> I question whether or not this is a multiple conspiracy case.... [A]ll of these people included in the allegation ... relate[ ] to sources of drugs to effect the object of the conspiracy, to wit, distributing drugs in Fayette County. I viewed it as a single-object conspiracy.

Under the facts of this case, we will excuse defendant's failure to object to the single conspiracy instruction. The District Court's ruling on Abushanab's motion was couched in sufficiently broad terms that defendant could reasonably believe that a separate motion was futile. Thus, we will not limit our review to plain error.

■ "A district court is not required to give a multiple conspiracy instruction where only one conspiracy is alleged and proved." *United States v. Lash,* 937 F.2d 1077, 1086 (6th Cir.), *cert. denied,* 502 U.S. 949, 112 S.Ct. 397, 116 L.Ed.2d 347 (1991). The indictment in the present case alleged a single conspiracy, so we turn our attention to the proofs at trial. The issue of "[w]hether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury ... and [is] to be considered on appeal in the light most favorable to the

government." *United States v. Segines,* 17 F.3d 847, 856 (6th Cir.1994) (quoting *United States v. Schultz,* 855 F.2d 1217, 1222 (6th Cir.1988)). We have previously held that

> in determining whether the evidence showed single or multiple conspiracies it must be remembered that the essence of the crime of conspiracy is agreement; and that in order to prove a single conspiracy the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal.

*United States v. Paulino,* 935 F.2d 739, 748 (6th Cir.), *cert. denied,* 502 U.S. 914, 112 S.Ct. 315, 116 L.Ed.2d 257 (1991). We have also stated that

> A conspirator need not have agreed to commit every crime within the scope of the conspiracy, so long as it is reasonable to infer that each crime was intended to further the enterprise's affairs.... Moreover, it is not necessary for each conspirator to participate in every phase of the criminal venture, provided there is assent to contribute to a common enterprise.

*United States v. Hughes,* 895 F.2d 1135, 1140 (6th Cir.1990) (citations omitted). It is often possible, especially with drug conspiracies, to divide a single conspiracy into sub-agreements. *See, e.g., United States v. Rugiero,* 20 F.3d 1387, 1392 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 208, 130 L.Ed.2d 137 (1994); *United States v. Rios,* 842 F.2d 868, 872–73 (6th Cir.1988), *cert. denied,* 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989). This does not, however, mean that more than one conspiracy exists. The key is to determine whether the different sub-groups are acting in furtherance of one overarching plan. *Rugiero,* 20 F.3d at 1392.

■ In the present case, as the District Court found, the evidence supported a finding that only one conspiracy existed. Defendant and his co-conspirators were involved in a conspiracy to distribute cocaine and marijuana in the Lexington, Kentucky area. The fact that Defendant had two different sources of the drugs, one in Chicago and one in Tampa, does not alter the fact that only one conspiracy existed. Accordingly, the District Court did not err in refusing to give a multiple conspiracy instruction.

## C. Closing Arguments

■ Defendant argues that both the prosecutor and Abushanab's attorney delivered inflammatory closing statements. According to defendant, both attorneys improperly appealed to the "community conscience" of the jurors, as well as to society's interest in ridding itself of drug dealers. The government contends that neither its nor Abushanab's closing argument were improper, and, in any event, Abushanab's closing cannot be attributed to the government.

Because defendant failed to object at trial, we review only for plain error. In reviewing this type of claim, we must first determine whether the remarks made were improper. *United States v. Carroll,* 26 F.3d 1380, 1387 (6th Cir.1994). Defendant points our attention to five quotations that he contends were inflammatory and prejudicial. Two statements were made by the prosecutor and three by Abushanab's attorney. Defendant alleges that the first four statements improperly appealed to the jury's community conscience. We now set out these contested portions of the closing arguments. We have italicized the portions of the quotations that are alleged to be error:

> There is no way that they can remember every place they ever dealt cocaine. My goodness, ladies and gentlemen, if I had to ask them to sit down and write a list up for me, we would probably be shocked and surprised to see the different places here in Lexington, Kentucky where cocaine is being distributed. *It probably went on in just about every corner and every block in this community during the three years that they were involved in this.* So the fact that Gwen would remember that, Osama didn't, well, I would suggest to you, ladies and gentlemen, that that doesn't mean that that didn't happen.

Tr. IX at 14–15 (Prosecutor).

> You know, a shell game in a carnival moves from town to town taking people's money, and you don't want anybody to look at you anymore than two or three times,

because you figure it out and then you won't put your money up. And until Van Spencer took a second and third look at Reda Ghazaleh and started analyzing it with Earl McKigney in the DEA office, he would have continued. *But they stopped him. They stopped a cancer on this society.*

Tr. IX at 53–54 (Abushanab's attorney).

*You know, as citizens I know it is frustrating sometimes to think you can't do much in this community or this society about changing anything. You can vote, and your vote doesn't mean a hill of beans in a national election. You know it, and I know it. But we do it because we want to be a part of it. And if you want to tell Larry Hopkins to do something in Congress, you can't get things changed or senators or whoever. We're little.*

*But you have got a chance to do one of the most important things that you will ever do in your life, and that's to find him [Abushanab] not guilty. Don't guess him guilty.*

Tr. IX at 73–74 (Abushanab's attorney).

These folks are drug dealers, ladies and gentlemen. *They are the ones that have come in here and they've plagued the community with this kind of stuff.*

Tr. IX at 109 (Prosecutor).

We need not decide whether the same standards that govern the closing statements of prosecutors also govern those of a co-defendant. Even if they do, it is clear that none of these five statements rises to the level of impropriety and prejudice required to reverse a conviction. A review of our prior decisions shows that the type of appeal we have considered improper is one where the prosecutor urges the jury to send a message to all drug dealers in the community by convicting the defendant. *See, e.g., United States v. Johnson,* 968 F.2d 768 (8th Cir. 1992); *United States v. Solivan,* 937 F.2d 1146 (6th Cir.1991). None of the four comments set forth above stepped over that line. Instead, they were directed at the actual activities of the particular defendant on trial.

■ Defendant also contends that the following statement by Abushanab's attorney improperly vouched for the credibility of several witnesses. Again, we have italicized the contested portion:

[The agents] proved a case through surveillance and interlinking co-defendants, which ties a noose around him that he can't get out of, Ghazaleh. He is air tight because of their proof. *They have overwhelming evidence of guilt presented by Osama Shalash, Mazen Shunnarah, Gwendolyn Perkins and then the other people who all supported those three people's testimony.*

Tr. IX at 48.

Improper vouching occurs when the prestige and authority of the government are placed behind the witnesses to support their credibility. Even if such an action can be accomplished by a co-defendant's attorney, it did not happen in this case. Accordingly, none of the remarks pointed to by defendant were improper, and they therefore do not supply grounds for reversing his conviction.

### D. Sentence Enhancement for Role in the Offense

■ Defendant contends that the District Court erred in concluding that he was a leader or organizer of the conspiracy under U.S.S.G. § 3B1.1(a) and in enhancing his sentence accordingly. Defendant argues that the evidence at best shows that he was a middleman, as opposed to a leader, and that he did not supervise a sufficient number of people to warrant the four-level enhancement.

The Sentencing Guidelines provide for a four level increase in offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive" U.S.S.G. § 3B1.1(a). This court has held that the trial court's determination that a defendant played an aggravating role under section 3B1.1 is " 'heavily dependant on the facts.' " *United States v. Okayfor,* 996 F.2d 116, 122 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 238, 126 L.Ed.2d 192 (1993). Accordingly, any such sentence enhancement "is reversible only if clearly erroneous." *Id.* A district court's findings must be supported

by a preponderance of the evidence. *United States v. Stubbs*, 11 F.3d 632, 641 (6th Cir. 1993).

The Presentence Report recommended that defendant receive an enhancement for his role in the offense. Defendant objected to the recommendation, and the District Court heard argument on this issue at the sentencing hearing. In issuing its ruling, the lower court stated:

> Well, I think based upon the record—of course, at the trial this defendant denied by and large any responsibility or any involvement with all of these people. And but clearly he—Mr. Ghazaleh was the linchpin. He was the linchpin. And all of these people that have been named in the indictment, all of the people that in addition to that that weren't in this indictment—I think Mr. Boston was indicted in a separate indictment that Judge Forester took care of. I believe that there is sufficient evidence to sustain this enhancement, and the Court finds that the defendant was the organizer and leader of a right significant drug conspiracy. So the objection will be overruled.

We cannot say that this finding is clearly erroneous. As we discussed above, the government presented evidence to show that defendant was a high level player in a drug conspiracy that, over the course of several years, brought large quantities of drugs into the Lexington, Kentucky area. While the District Court did not explicitly name the people organized by defendant, this issue was discussed during the sentencing hearing. In addition, when issuing its ruling the District Court did refer to the other persons named in the indictment. The indictment named eleven people, including defendant and Abushanab. If we subtract those two names, and add that of Boston, we end up with a total of ten people, which is clearly sufficient to satisfy the requirements of the Guidelines.

### III.

For the foregoing reasons, we **AFFIRM** defendant's conviction and sentence.