**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Angela ELDER (94–5307); Douglas Jones (94–5309); David L. Jackson, Jr. (94–5310); David L. Jackson, Sr. (94–5331); Mark A. Andrews (94–5332); Ray Fletcher (94–5391); Thomas J. Elder (94–5393); Bernard Leon Kelly (94–5395); Ross Grimes (94–5397), Defendants–Appellants.**

**Nos. 94–5307, 94–5309, 94–5310, 94–5331, 94–5332, 94–5391, 94–5393, 94–5395, 94–5397.**

United States Court of Appeals, Sixth Circuit.

Argued and Submitted April 15, 1996.

Decided July 24, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied in No. 94–5393 Sept. 18, 1996.

Michael E. Winck, Asst. U.S. Atty. (briefed in Nos. 94–5307, 94–5309 and 94–5331) (argued and briefed in Nos. 94–5310, 94–5332, 94–5391, 94–5393, 94–5395 and 94–5397), Office of the U.S. Atty., Knoxville, TN, for U.S.

Tommy K. Hindman (briefed), Knoxville, TN, for Angela C. Elder in No. 94–5307.

Gordon Ball (briefed), Knoxville, TN, for Douglas Lamont Jones in No. 94–5309.

James A.H. Bell (argued and briefed), Law Offices of James A.H. Bell, Knoxville, TN, for David Lawrence Jackson, Jr. in No. 94–5310.

Mark E. Silvey (briefed), Knoxville, TN, for David Lawrence Jackson, Sr. in No. 94–5331.

John E. Eldridge (argued and briefed), Ray, Farmer, Eldridge & Hickman, Knoxville, TN, for Mark Anthony Andrews in No. 94–5332.

Gloria S. Moore (argued and briefed), Moore & Clark, Knoxville, TN, for Raymond Fletcher in No. 94–5391.

James H. Varner, Jr. (argued and briefed), Eshbaugh, Simpson & Varner, Knoxville, TN, for Thomas Jerome Elder in No. 94–5393.

William L. Brown (argued and briefed), Knoxville, TN, for Bernard Leon Kelly in No. 94–5395.

Charles A. Thomas (argued and briefed), Knoxville, TN, for Ross Grimes in No. 94–5397.

Before: CONTIE, NELSON, and COLE, Circuit Judges.

CONTIE, Circuit Judge.

Defendants appeal their jury convictions and sentences for conspiracy to distribute cocaine, money laundering, engaging in a continuing criminal enterprise, and various substantive offenses involved in the conspiracy. For the following reasons, we affirm the judgment of the district court.

I.

This case involves the Florida Boys gang, which developed distribution systems for selling cocaine in Knoxville, Tennessee. On March 3, 1993, a federal grand jury in the Eastern District of Tennessee returned a 126–count indictment charging defendants with conspiracy to distribute cocaine from the fall of 1986 until March 1993, and with various related offenses including distributing cocaine, conducting a continuing criminal enterprise, using a telephone to facilitate the distribution of cocaine, possession of a pipe bomb, and money laundering. Originally 18 defendants were charged, but several defendants and several unindicted coconspirators became cooperating witnesses for the United States.[1]

According to the trial testimony of the cooperating witnesses, defendant Jones, the leader of the gang, obtained cocaine in Florida, stored the drugs in a stash house there, and then had the cocaine transported to

---

1. The defendants charged in the indictment were Douglas Lamont Jones, Nathaniel Watson, Devin Davis, Raymond Fletcher, Mark Andrews, James Sims, Ross Grimes, Anthony Hamilton, Bernard Kelly, Willie White, Sanford Miller, David Lawrence Jackson, Sr., David Lawrence Jackson, Jr., Gerald Mills, Denise Troutman, Angela Elder, Thomas Elder, and Conrad Sherman.

Codefendants Davis, Watson, Mills and Hamilton were charged in the conspiracy count. Davis and Watson were charged in additional money laundering counts. All four codefendants pled guilty to the conspiracy count, and Davis also pled guilty to a money laundering count prior to trial pursuant to plea agreements. These four

were the codefendants who became cooperating witnesses for the government. Codefendant Sherman, who was charged in count 27, a distribution count, was never arrested and was dismissed from the case. The case went to trial with 13 defendants.

Unindicted coconspirators Anthony Kelly, Leroy Adderly, and Jesse Anthony at the time of the filing of the indictment were in prison serving sentences for other convictions. They cooperated with the government in hopes of getting reductions in their respective sentences. Louis Cannamore had pled guilty to conspiring to distribute cocaine and agreed to cooperate.

Knoxville, Tennessee in rented trucks, usually concealed in a spare tire. The cocaine was taken to one of defendant Jones' friends' apartments or other apartments rented by the Florida Boys gang.[2] The gang then divided the cocaine among various lieutenants in the organization, who were responsible for its distribution, mainly at two housing projects in Knoxville—College Homes and Austin Homes.

Unindicted coconspirator Anthony Kelly, who was based in Boynton Beach, Florida, testified that beginning in 1987, he began fronting drugs to defendant Jones, who then transported the cocaine to Knoxville, Tennessee, sold the cocaine, and then paid Kelly between $25,000–$35,000 per kilogram for the amounts he had been fronted. After Kelly was arrested in 1989, Jones continued to obtain drugs from Florida from other sources.

Defendant Jones had a second source for the cocaine sold by his "boys" in Knoxville, which came from Macon, Georgia. Jesse Anthony, an unindicted coconspirator, testified at trial that he traveled to Tennessee from Georgia in the fall of 1986 to give out free cocaine samples in order to establish a market in Knoxville. Under the direction of Jones, he set up shop at College Homes and oversaw selling drugs there. He testified that there was a shoot-out at College Homes between one of the "Florida Boys," James Brown, and Brian Ross, a member of a rival drug gang, who was killed. Jesse Anthony testified that after this shoot-out, he returned to Macon, Georgia and no longer distributed drugs in Knoxville for Jones. Anthony testified that after he left, defendant Grimes was the one who organized the drug sales at College Homes.

Codefendant Anthony Hamilton testified that he knew Jesse Anthony and helped him distribute the free samples that began the drug trade at College Homes. He also testified that defendant Grimes helped sell cocaine there and that after coconspirator

Jesse Anthony's return to Georgia, Grimes became responsible for directing the sale of cocaine at College Homes. Anthony Hamilton was arrested by the police for selling cocaine at College Homes in June 1988, before the other coconspirators were indicted. After his arrest, most cocaine was sold from Austin Homes rather than College Homes.

Various officers of the Knoxville Police Department started looking into the Florida Boys organization in the fall of 1991 and testified at trial about their investigation. Various narcotics agents of the DEA testified about their surveillance of Jones and his gang in Florida and in Knoxville and about telephone conversations which had been tape-recorded after wiretaps were ordered. Various undercover agents, including Mark Poag, Deborah Allen, and Charles Beneby, testified about drug purchases they set up with members of the gang.

After the jury trial, which began on October 4, 1993, and concluded on November 23, 1993, the defendants who are bringing this appeal were convicted as follows:[3] Thomas Elder was convicted of the continuing criminal enterprise charge in count 124 and the cocaine distribution charges in counts 125 and 126. Angela Elder was convicted of the conspiracy charge in count 2 and the money laundering offenses of counts 36, 37, 68 and 69. Defendant David Jackson, Jr. was convicted of the conspiracy charge in count 2, as were defendants Bernard Kelly, Ross Grimes, Ray Fletcher, and David Jackson, Sr. Defendant Mark Andrews was convicted of the conspiracy charge in count 2, for using a telephone to facilitate the distribution of cocaine in counts 7 and 9, the cocaine distribution charges of counts 8, 12 and 16, possession of a pipe bomb in count 18, and money laundering as charged in counts 118–122. Defendant Douglas Jones was convicted of the following: engaging in a continuing criminal enterprise in count 1; conspiracy in count 2; the distribution of cocaine in counts 12 and 16; using a telephone to facilitate the distribution of cocaine in counts 13 and 15;

2. These included the apartments of Denise Troutman and Angela Elder and the apartments at Merchants Drive and at Concepts 21.

3. Two codefendants, James Sims and Willie White, filed an appeal initially, but their appeals have been dismissed. Codefendant Denise Troutman was acquitted, and codefendant Sanford Miller did not appeal his conviction.

and the money laundering offenses charged in counts 28–123. The jury ordered the forfeiture of Jones' property as described in counts 1, 12 and 16.[4]

Defendants filed timely notices of appeal.

## II. *Rule 28(i)*

██ Pursuant to Fed.R.App.P. 28(i), defendants-appellants moved to adopt the issues, arguments and authorities advanced by their co-appellants in this cause. Rule 28 provides in pertinent part: "In cases involving more than one appellant or appellee, . . . any appellant or appellee may adopt by reference any part of the brief of another." We agree with the prevailing case law that notwithstanding the permissive generalities in which the Rule is couched, there are definite limits on the ability of parties to adopt each other's appellate arguments by reference pursuant to Rule 28(i). One such limit is that the arguments adopted must be readily transferable from the proponent's case to the adopter's case. *United States v. David*, 940 F.2d 722, 737 (1st Cir.), *cert. denied*, 502 U.S. 989, 112 S.Ct. 605, 116 L.Ed.2d 628 (1991). As the court in *United States v. Harris*, 932 F.2d 1529 (5th Cir.), *cert. denied*, 502 U.S. 897, 112 S.Ct. 270, 116 L.Ed.2d 223 (1991) indicated, adoption pursuant to Rule 28(i) is permitted in the interest of judicial efficiency when the arguments to be adopted are equally applicable to the adopting co-appellants; however, when one appellant raises fact-specific issues, a motion to adopt that appellant's argument, without more, is insufficient to raise that point of error as to the adopting co-appellant. *Id.* at 1533. *See also United States v. Bennett*, 75 F.3d 40, 49 (1st Cir. 1996) (counsel, who uses Rule 28(i) to incorporate another appellant's brief into that of counsel's client, must connect the arguments adopted with the specific facts pertaining to the client); *United States v. Stouffer*, 986 F.2d 916, 921 n. 4 (5th Cir.) (when a defendant seeks to adopt by reference an issue raised by his codefendant pursuant to Rule 28(i) and the issue is fact-specific, the court will consider the merits of that issue only as

to the party raising it), *cert. denied*, 510 U.S. 837, 114 S.Ct. 115, 126 L.Ed.2d 80 (1993); *United States v. Isabel*, 945 F.2d 1193, 1200 (1st Cir.1991) (adoption by reference cannot occur in a vacuum; to be meaningful, the arguments adopted must be readily transferable); *United States v. Swingler*, 758 F.2d 477, 493 (10th Cir.1985) (Rule 28(i) does not oblige the court to manufacture an argument just because a defendant refers to an inapplicable argument by another codefendant).

██ For these reasons, we hold that in the present case, in regard to the fact-specific issues in which the adopter's evidence is materially different from that of the proponent, the adopter's attempt to incorporate by reference the proponent's arguments pursuant to Rule 28(i) does not adequately develop or preserve the issue with respect to his or her own appeal. As the court in *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.), *cert. denied*, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990) stated, it is a "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." Therefore, we decline to consider pursuant to Rule 28(i), the arguments of codefendants which are fact-specific and are not readily transferable. In regard to arguments that are transferable, whether or not indicated further in this opinion, each error asserted by a codefendant has been considered where appropriate as applicable to the other defendants. For purposes of discussion, we first address the issues which could affect all the convictions presented for review. We then discuss issues applicable only to individual defendants.

## III. *Motions to Sever*

██ Defendants contend that the district court abused its discretion by failing to grant a severance of their trials from the remaining codefendants. The district court's denial of severance is reversible for an abuse of discretion by the trial court. *United States v. Warner*, 690 F.2d 545, 551 (6th Cir.1982). Pursuant to Fed.R.Crim.P. 14, a

---

**4.** Count 1 contained a provision for the forfeiture of property obtained from engaging in a continuing criminal enterprise. Counts 12 and 16 included forfeiture provisions forfeiting defendants Jones' and Andrews' interests in currency used to purchase cocaine on two separate occasions.

severance may be granted if prejudice would result to an individual defendant tried jointly with another.

■ Defendants contend that this case went to trial with 13 defendants and that confusing evidence was presented over a four-week period in which over 100 witnesses were called. Defendants argue that in some instances the charges for which they were indicted were completely unrelated to other charges in the indictment; for example, some allege that the money laundering charges were completely unrelated to the conspiracy charges. Defendants argue that they were prejudiced by the spill-over effect of the accumulation of evidence against other defendants which had absolutely no relation to them. *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993); *United States v. Gallo*, 763 F.2d 1504, 1525 (6th Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986).

More specifically, defendants raise the issue that defendant Thomas Elder was charged in a separate trial with murdering four children in the December 6, 1992 fire bombing of a Knoxville home in relation to his business of selling cocaine. They contend that in the present case Elder, an alleged murderer, was charged with engaging in a continuing criminal enterprise and distributing cocaine, offenses that had no factual connection to any other events in the conspiracy with which they were charged. They argue that they suffered substantial prejudice by their joinder with Elder because of the publicity surrounding the murder of four innocent children. Defendants contend that failure to grant their motions for severance robbed them of the right to a fair trial and resulted in a verdict based on bias, prejudice, or confusion due to the enormous complexity of the case rather than on the specific evidence presented against each of them individually. *United States v. Hatcher*, 423 F.2d 1086, 1089 (5th Cir.), *cert. denied*, 400 U.S. 848, 91 S.Ct. 35, 27 L.Ed.2d 86 (1970).

We do not believe these arguments have any merit. Under Fed.R.Crim.P. 8(b), the following is provided:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

In the present case, all of the counts in the indictment were logically related. Count 2 charged 17 defendants with conspiring to distribute and possession with intent to distribute cocaine, and the other counts involved overt acts in furtherance of the conspiracy. Count 1 charged defendant Jones with engaging in a continuing criminal enterprise and listed as predicate offenses the conspiracy of count 2 and various substantive offenses involving the conspiracy. Count 124 charged defendant Elder with engaging in a continuing criminal enterprise and listed the conspiracy in count 2 and the drug distribution offenses of counts 125 and 126 as predicate offenses. Counts 28 through 123 were money laundering counts, alleging that the wire transfer of funds from Tennessee to Florida involved the proceeds of the unlawful distribution of cocaine and the conspiracy to distribute cocaine. A trial memorandum filed by the United States six weeks prior to trial outlined each defendant's role in the conspiracy and how the charges were interrelated.

We find that the evidence indicates that defendants participated in a series of acts or transactions constituting the offenses set forth in the indictment, which were logically related. Although defendant Elder was acquitted of the conspiracy count, there was evidence that he obtained cocaine from defendant Jones. Therefore, joinder was proper. *See United States v. Lloyd*, 10 F.3d 1197, 1215 (6th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1569, 128 L.Ed.2d 213 (1994); *United States v. Franks*, 511 F.2d 25, 30 (6th Cir.), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2654, 2656, 45 L.Ed.2d 693 (1975).

■ Since joinder was proper under Rule 8(b), the only remaining question is whether severance was mandated by Rule 14 due to prejudice. *United States v. Horton*, 847 F.2d

313, 317 (6th Cir.1988). In regard to defendants' arguments that they were prejudiced by the spill-over effect of the accumulation of evidence against other defendants, the record reveals that the evidence pertaining solely to defendant Thomas Elder was easy to compartmentalize and to separate from the evidence against the other defendants. Because there was no evidence offered against defendant Elder that could have been confusing to the jury and held against other defendants, defendants have offered no examples of prejudice. As the court stated in *United States v. Medina,* 992 F.2d 573, 587 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 371 (1994), a jury will be presumed capable of sorting out the evidence applicable to each defendant and rendering its verdict accordingly. Moreover, in the present case, the jury's verdict reflects an individualized determination of each defendant's guilt, thereby suggesting that the defendants were not prejudiced by any cumulative evidence. *United States v. Rugiero,* 20 F.3d 1387, 1391 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 208, 130 L.Ed.2d 137 (1994). None of the defendants who were indicted on multiple counts were convicted for all the counts for which they were indicted, and the verdicts reflected an individualized determination of each defendant's guilt.

■ Defendants' argument that they were prejudiced because they would have called codefendants as witnesses if their trials had been severed has no merit. Under this court's opinion in *United States v. Causey,* 834 F.2d 1277, 1287 (6th Cir.1987), *cert. denied,* 486 U.S. 1034, 108 S.Ct. 2019, 100 L.Ed.2d 606 (1988), a defendant must indicate that a codefendant will, in fact, testify if the cases are severed. In the present case, no such indication was made. Therefore, defendants fail to substantiate this claim of prejudice.

The counts in the indictment were properly joined and defendants suffered no prejudice as a result of the district court's discretionary decision to refuse to sever the cases. The district court is affirmed on this issue.

## IV. *Sufficiency of the Evidence*

■ Defendants argue that the evidence failed to establish their guilt and the district court erred in denying their motions for acquittal pursuant to Fed.R.Crim.P. 29. The standard of review for claims of insufficient evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Lee,* 991 F.2d 343, 347 (6th Cir.1993).

### A. *Conspiracy*

■ The essential elements of conspiracy under 21 U.S.C. § 846 are: (1) an agreement by two or more persons to violate the drug laws, and (2) each conspirator "knew of, intended to join and participated in the conspiracy." *United States v. Phibbs,* 999 F.2d 1053, 1063 (6th Cir.1993), *cert. denied,* 510 U.S. 1119, 114 S.Ct. 1070, 127 L.Ed.2d 389 (1994). Defendants argue that the evidence produced by the government basically consisted of the testimony of coconspirators who agreed to cooperate with the government in return for reduced sentences, and their incriminating testimony was therefore unreliable.

■ Although, as defendants contend, much of the evidence at trial was from coconspirators, their testimony was corroborated by independent evidence. In regard to the coconspirator testimony about defendant Jones, numerous people testified that Jones transported cocaine to Knoxville from Florida and from Georgia, including Anthony Kelly, who was Jones' first source of supply in Florida, and Jesse Anthony, who came from Macon, Georgia to start dealing cocaine at College Homes under the direction of defendant Jones. Coconspirators testified that defendant Jones had others rent apartments used by the Florida Boys to operate their drug organization in Knoxville. They described how defendant Jones transported cocaine from Florida to Tennessee in the spare tires of rented trucks, organized the selling of the cocaine, and hired look-outs while cocaine was being sold at College Homes and

Austin Homes. There was testimony that the money from the sale of cocaine ultimately went back to defendant Jones. The testimony of the coconspirators corroborated each other.

The evidence also indicated that defendant Jones spent thousands of dollars for airline tickets between Florida and Tennessee; thousands of dollars for the rental of vehicles used to transport the cocaine from Florida to Tennessee; and many thousands of dollars for the purchase of cocaine for resale in Knoxville. Although much of this evidence came in the form of coconspirator testimony, it was corroborated with other evidence, including the following: business records demonstrating 33 round trips on Delta Airlines by defendant Jones between Florida and Knoxville; records of over $107,000 in wire transfers from Knoxville to Florida to members of the gang or to Jones' family; telephone records demonstrating contact between defendant Jones and other coconspirators, including sources of supply in Florida; rental records showing over $19,000 in vehicle rentals by defendant Jones and his coconspirators, with at least 22 vehicles being driven sufficient miles for round trips between Boynton Beach, Florida and Knoxville, Tennessee. There were also video tapes, apartment leases, pen registers, and taped telephone conversations to corroborate the testimony of coconspirators concerning Jones' guilt. We, therefore, find there was sufficient evidence to convict him.

In regard to defendant Bernard Kelly, coconspirators testified that he transported cocaine from Florida to Tennessee, collected drug money at Austin Homes, sold cocaine, and frequented the apartment at Concepts 21. There is independent evidence to corroborate the cooperating witnesses' testimony in the form of the testimony of Shaundra Scruggs, the girlfriend of defendant Fletcher, who testified that before and after she and defendant Fletcher went to Florida to acquire cocaine, they met with "Fridge" and others to acquire money and to deliver the cocaine. An abundance of testimony indicated defendant Kelly was known as "Fridge."

In regard to defendant Fletcher, the testimony at trial revealed that on several occasions he traveled to Florida to acquire cocaine from defendant Jones and that he then sold the cocaine in Knoxville, using his own distribution system. This evidence was provided not only by coconspirators, but also by defendant Fletcher's girlfriend, who traveled with him to Florida when he acquired between two and four kilograms of cocaine. In addition, there was testimony that he pooled money with others to purchase cocaine from defendant Jones and that Jones had delivered a kilogram to Fletcher in Knoxville. Defendant Fletcher's travel to Florida for cocaine was corroborated by a recorded telephone conversation between an informant and defendant Andrews. In addition, other recorded conversations indicated Fletcher was involved in the sale of cocaine that he had received from defendant Jones.

In regard to defendant Jackson, Jr., several coconspirators testified that in the spring of 1989, defendant Jackson, Jr. began working as a look-out at Austin Homes, was paid on a weekly basis by defendant Jones, and beginning in 1991, sold cocaine that he received from Jones at Austin Homes. An independent corroboration of this testimony involved an impounded truck which defendant Jackson, Jr. broke into in order to seize the cocaine hidden inside. A coconspirator testified about the incident, which was corroborated by a conversation overheard by Special Agent Poag between defendant Jackson, Jr. and informant Deborah Allen.

In regard to defendant Jackson, Sr., three coconspirators testified that after Nate Watson left the Florida Boys gang in the spring of 1989, defendant Jackson, Sr. began working as a look-out at Austin Homes during the sale of cocaine and was paid on a weekly basis by defendants Jones and Cannamore for doing so. A person who was a cocaine user at Austin Homes testified that, on occasion, defendant Jackson, Sr. sold him cocaine. There was also evidence that cocaine was sold by the Florida Boys organization in front of defendant Jackson, Sr.'s Austin Homes apartment and that he allowed Florida Boys members to use his apartment as needed.

In regard to defendant Angela Elder, there was evidence that while she lived with

defendant Jones and dated him, he used her residence as one of his bases of operation to direct the Florida Boys organization and stored cocaine there. Telephone records and intercepted telephone calls indicated Angela Elder received and conveyed messages from defendant Jones to other coconspirators. Additionally, defendant Angela Elder wire-transferred money to defendant Jones' relatives in Florida, which was corroborated by telephone records and by Angela Elder's name appearing on the wire transfers.

■ Defendant Grimes argues that there was insufficient evidence to overcome his defense that he left the conspiracy before March 4, 1988, more than five years before the return of the indictment, and therefore his prosecution and conviction were barred by the five-year statute of limitations mandated by 18 U.S.C. § 1382. Defendant Grimes was charged with only one count, the conspiracy count of count 2. Pursuant to 18 U.S.C. § 1382, the law requires that the prosecution of a person for conspiracy must be instituted within a five-year statute of limitations. Defendant Grimes argues that the evidence indicates he withdrew from participation in the conspiracy more than five years prior to the March 4, 1993 filing of the indictment. He contends he left the Florida Boys gang in 1987, and on March 4, 1988, he was no longer a member of the gang. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887–88, 57 L.Ed.2d 854 (1978).

Defendant Grimes testified on his own behalf and had several witnesses testify that he had withdrawn from the Florida Boys organization in late 1987 and was no longer part of the gang in March 1988. One of these witnesses was his girlfriend, Stephanie Abrams. However, this testimony was contradicted by the testimony of codefendant Hamilton, who testified that after the shooting of Bryan Ross at College Homes and coconspirator Jesse Anthony's return to Macon, Georgia, defendant Grimes and coconspirator Millines became responsible for directing the sale of cocaine at College Homes. Hamilton testified that he worked with defendants Grimes, Watson, and Millines selling cocaine at College Homes until he was arrested in June

1988. Anthony Kelly testified that he saw Grimes on two or three occasions when he visited Knoxville in 1987–1988. Thus, there is evidence that Grimes was still involved in the conspiracy in June 1988.

The government argues that the testimony of defendant Grimes and other witnesses called by him was in significant respect internally inconsistent and conflicted with other testimony demonstrating that Grimes continued to participate in the Florida Boys organization beyond late 1987 and after March 4, 1988. Since the evidence is to be viewed in the light most favorable to the prosecution, it is reasonable to conclude that the jury disregarded the testimony of defendant Grimes and his witnesses concerning his alleged 1987 withdrawal from the Florida Boys organization and believed coconspirator Hamilton's testimony that defendant Grimes was involved with the organization until June 1988. Assessing the credibility of the witnesses is the province of the jury. Therefore, Grimes' argument that there was insufficient evidence that he was a member of the conspiracy in March 1988 has no merit.

To conclude, for all of the above stated reasons, there was sufficient evidence to convict defendants Jones, Bernard Kelly, Fletcher, Grimes, Jackson, Sr., Jackson, Jr., and Angela Elder of conspiracy to distribute cocaine as charged in count 2. The district court is affirmed on this issue.

### B. *Continuing Criminal Enterprise*

In regard to the continuing criminal enterprise convictions, defendants Jones and Thomas Elder argue that the United States failed to prove that they had anything other than a buyer-seller relationship with other coconspirators.

■ In order to convict a defendant of engaging in a continuing criminal enterprise, the United States must prove: (1) that the defendant committed a felony violation of the federal narcotics law; (2) that the violation was part of a continuing series of three or more drug offenses committed by the defendant; (3) that the defendant committed the series of offenses in concert with five or more persons; (4) that the defendant acted as an

organizer, supervisor, or manager with regard to these five or more persons; and (5) that the defendant obtained substantial income or resources from this series of violations. 21 U.S.C. § 848(c); *see, e.g., United States v. Phibbs,* 999 F.2d at 1082; *United States v. English,* 925 F.2d 154, 156 (6th Cir.), *cert. denied,* 501 U.S. 1210, 111 S.Ct. 2810, 115 L.Ed.2d 983 (1991). Merely proving that five people were in a buyer-seller relationship with the alleged organizer or supervisor is not sufficient to show management. *United States v. Chalkias,* 971 F.2d 1206, 1213 (6th Cir.), *cert. denied,* 506 U.S. 926, 113 S.Ct. 351, 121 L.Ed.2d 265 (1992).

■ Defendant Jones argues that the district court erred in denying his motion for a determination of the five persons who were allegedly managed by him. He contends that the "laundry list" of persons presented to the jury consisted mostly of individuals who were in a buyer-seller relationship with him and were not five individuals over whom he asserted the requisite management.

■ We disagree with this argument. The evidence was sufficient for the jury to find that defendant Jones acted in concert with five or more persons for whom he acted as an organizer, supervisor, or manager. The evidence established that the persons who worked at the direction of defendant Jones were coconspirators Jesse Anthony, Vincent Millines, James Brown, Eric Louis, Bernard Jefferson, Louis Cannamore, and defendants Davis, Watson, Mills, Hamilton, Grimes, White, Sims, Angela Elder, Jackson, Jr., Jackson, Sr., Andrews, and Bernard Kelly. Although the evidence indicated that some coconspirators would have other coconspirators sell cocaine for them and some assumed day-to-day supervision of individual coconspirators, this does not release defendant Jones from responsibility for supervising and managing the overall organization. This court in *United States v. Patrick,* 965 F.2d 1390, 1397 (6th Cir.), *cert. denied,* 506 U.S. 940, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992) held that an individual need not have direct communications with participants in order to be their supervisor. There is no indication that this list of people in the organization was an erroneous list of persons managed by defendant Jones; therefore the district court was not required to give a jury instruction about persons who could not be considered to have been managed by defendant as part of a CCE in order to avoid confusion. *See United States v. Phibbs,* 999 F.2d at 1087. There was sufficient evidence to convict defendant Jones of engaging in a continuing criminal enterprise.

Defendant Elder argues that the evidence was insufficient to support his conviction for engaging in a continuing criminal enterprise from the summer of 1992 until December 6, 1992, because the government failed to prove that an organization consisting of at least five persons under his supervision existed, relying on *United States v. Bond,* 847 F.2d 1233, 1237 (7th Cir.1988). In *Bond,* the court stated that a small-time dope dealer who employs a single individual to sell drugs and replaces that person on a monthly basis with a new person until five people have each separately worked for the drug dealer cannot be considered as engaging in a continuing criminal enterprise. Defendant Elder argues that the testimony of the coconspirators who testified against him in the present case—Houston, Martin, Carvin, Moore, and Jordan—indicates that he was a small-time dealer and never managed more than four people at one time.

■ Defendant Elder's reliance on *Bond* fails to take into account the Seventh Circuit's subsequent decision in *United States v. Bafia,* 949 F.2d 1465 (7th Cir.1991), *cert. denied,* 504 U.S. 928, 112 S.Ct. 1989, 118 L.Ed.2d 586 (1992). There the court was faced with the same argument presented by defendant Elder in this case. In *Bafia,* the defendant, relying on *Bond,* argued that the government must prove that he supervised five persons simultaneously on at least one occasion, and that it was not sufficient to show that he supervised two or three people at one time and then three or four different people at another time. The Seventh Circuit rejected the argument that the government had to prove that the defendant supervised five other people in concert on at least one occasion. *Id.* at 1470–72. The court held that the statute does not require that five persons act in concert with each other; it is

sufficient to prove that the CCE defendant had a conspiratorial agreement with each of five underlings simultaneously. We agree.[5]

 The evidence supports the United States' contention that Elder managed an organization consisting of the threshold five members. Rodney Houston testified that he worked for defendant Thomas Elder from approximately August 1992 until December 1992. Houston testified that he had been with Josh Jordan, Marcus Carvin, Anthony Moore, and Stephen Taylor when they were also supervised in the sale of cocaine by defendant Thomas Elder.

Anthony Moore testified that he worked for defendant Thomas Elder in the summer of 1992 and worked for him for two or three months. Moore testified that Rodney Houston, Marcus Carvin, and Stephen Taylor also sold cocaine for defendant Elder and that he sold cocaine with Houston and Taylor, which had been acquired from defendant Thomas Elder. Josh Jordan testified that he sold cocaine for defendant Elder beginning in the summer of 1992 up through October 30, 1992, when he was arrested. Jordan testified that while he was selling cocaine for defendant Elder, he observed Rodney Houston and Anthony Cates (Anthony Moore) selling cocaine for defendant Elder and observed that Stephen Taylor accompanied Moore all the time.

William Martin testified that he sold cocaine for defendant Elder for approximately one month preceding the December 6, 1992 fire and that Marcus Carvin sold cocaine with him for defendant Elder. Marcus Carvin testified that he was introduced to defendant Elder by William Martin and that he, Carvin, sold cocaine for defendant Elder for approximately one month beginning in approximately November 1992 and continuing until December 6, 1992. Carvin testified that he sold cocaine with Rodney Houston, Anthony Moore, and Stephen Taylor, all of whom got their cocaine from defendant Elder.

The record thus indicates that in order for Marcus Carvin to have sold cocaine with Rodney Houston, Anthony Moore, and Ste-

phen Taylor, the time period in which they worked for defendant Thomas Elder had to overlap. Additionally, the testimony reveals that Marcus Carvin's and William Martin's service of employment by Elder overlapped. Therefore, at one point in time during the conspiracy, Rodney Houston, Anthony Moore, Stephen Taylor, Marcus Carvin and William Martin were being managed by defendant Thomas Elder.

In light of the above, there was sufficient evidence to establish that defendant Thomas Elder was guilty of conducting a continuing criminal enterprise. The district court is affirmed on this issue.

### C. Money Laundering

 In order to convict a defendant of money laundering, the government must prove beyond a reasonable doubt that the defendant engaged in the financial transaction knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. 18 U.S.C. § 1956(a)(1)(B)(i); *United States v. Lora,* 895 F.2d 878, 879 (2d Cir.1990). In the present case, defendant Jones was convicted of the 96 money laundering offenses charged in counts 28 through 123 of the indictment. He was charged in these offenses with causing others to conduct financial transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i) by having them send, by wire, drug proceeds to his family and other codefendants in Florida. Defendant Jones argues that there was no reliable proof that the transactions were anything other than ordinary transfers of money by his girlfriend or buddies to his family and others in Florida. He contends that the evidence shows there was not an attempt to conceal or disguise the source of the money.

Contrary to defendant Jones' contention, the evidence shows that defendant Jones used coconspirators to wire-transfer drug proceeds from Knoxville to Florida to members of his family, to his former girlfriend, and to other coconspirators for his benefit in

---

5. In light of *Bafia,* we find no error in the district court's failure to give defendant Elder's proposed jury instruction that the jury could not consider

persons who were successors or merely replaced people no longer involved in the organization.

such a way that the transfers concealed the true ownership of the funds since his name was not found on the wire-transfer business records. A total of $107,175 was wired-transferred from Knoxville to Florida, and the evidence indicates that defendant Jones was the true owner and person in control of the money comprising the wire transfers in counts 28 through 123. By directing coconspirators to send this money from Knoxville to Florida in the names of people other than his own, defendant Jones was insulating his exposure to these tainted funds. Moreover, instead of receiving the wire transfers himself, defendant Jones would often have coconspirator Davis receive the wire transfers and then hand the money over to defendant Jones without his name appearing on any records. Therefore, we believe there is sufficient evidence that defendant Jones caused or conducted these transactions in such a way as to conceal the true owner and controller of the funds—himself. There was sufficient evidence for his money laundering conviction.

■ Defendant Andrews was convicted on counts 118–122 for money laundering and acquitted on counts 63, 76, 94, and 95. Defendant Andrews states that there was no evidence that he sent any money transfers, arguing that the circumstantial evidence of a name appearing on a wire transfer is insufficient evidence to prove that he, Mark Andrews, knowingly and willfully conducted financial transactions affecting interstate commerce. He argues anyone could have signed his name to the wire transfers and that there was no evidence that he was the actual sender.

We do not believe defendant Andrews' arguments have any merit. Defendant Andrews argues there is no evidence to establish that he sent wire transfers from Knoxville to Florida. However, he was acquitted of those money laundering charges in which it was alleged that he sent money from Knoxville to Florida. Although his signature was on these transfers, no identification was required, and it was possible that someone used his name to send these funds. Defendant Andrews was convicted only of those money laundering charges in

which he was the recipient of money transfers from Knoxville to Florida. A Western Union financial services representative testified that if a person wire transfers money through Western Union, he must go to a Western Union agency and fill out a "To Send Money" form, which requires certain biographical data about the recipient. The person receiving the money has to fill out a "To Receive Money" form. The information on the "To Receive Money" form, including the identity of the person receiving the money and how much money that person was expecting, has to match the information on the "To Send Money" form. Additionally, the receiving party has to produce identification, unless the sending party submits an identification question to be answered by the receiving party. Defendant Andrews was convicted only on those counts concerning wire transfers in which the evidence demonstrated that he had to provide some form of identification in order to receive the funds in Florida. For these reasons, we believe there was sufficient evidence for his conviction of money laundering.

■ Angela Elder was convicted of money laundering violations in counts 36, 37, 68, and 69 of the indictment and acquitted of counts 34 and 35. She argues that the government failed to meet its burden of proof regarding the elements of the offense charged because there was no evidence of an intent to conceal anything in the wire transfers and no evidence that the money she wired constituted drug proceeds.

For the reasons stated in regard to Angela Elder's conviction on the conspiracy charge, her claim that there was no proof that she knew the money she was wiring to Florida constituted drug funds lacks merit. As previously discussed, defendant Jones at times operated his drug organization out of her residence and actively involved her in his drug business. She made wire transfers to him in Florida at a time when she asked him to pay her $275 telephone bill, which she could not afford to pay. Furthermore, intercepted telephone calls between defendants Jones and Angela Elder demonstrate that they discussed the money that she was sending back and forth, indicating that she was

aware the money was defendant Jones' money, that the money was sent in her name to conceal this fact, and that it constituted the proceeds of drug sales.

Defendant Angela Elder's argument that the jury returned inconsistent verdicts because it acquitted her of some money laundering charges also has no merit. She was acquitted of those charges for which the only evidence were computer printouts reflecting money sent by Angie Elder to Regina Jones and did not include the "To Send Money" form completed by the money sender with her signature on it. On the counts for which she was convicted, the evidence included these forms and her signatures. There was corroborating evidence in the form of tape-recorded conversations establishing that she wire-transferred the money alleged in one of those counts, and the signatures involved in the other counts appeared to have been written by the same person.

To conclude, there was sufficient evidence for the convictions of defendants Jones, Angela Elder, and Andrews for money laundering.

## V. *Amount of Cocaine*

 Defendants Jones, Andrews, Fletcher, Kelly, Jackson, Jr. and Jackson, Sr. contend that the district court erred in its computation of the amount of cocaine attributable to them as a result of their convictions for the conspiracy charged in count 2. Once a court finds a defendant guilty of conspiracy, the judge must determine the amount of drugs involved by the preponderance of the evidence standard, and sentence the defendant accordingly. *United States v. Lloyd,* 10 F.3d at 1219. A defendant is responsible for the amount of cocaine that he actually distributes and any amount of cocaine distributed by coconspirators in furtherance of the execution of the jointly undertaken criminal activity, which was reasonably foreseeable to the defendant. *United States v. Jenkins,* 4 F.3d 1338, 1345–46 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1547, 128 L.Ed.2d 197 (1994). When sentencing the defendant, the judge may only attribute to him the quantity of cocaine reasonably foreseeable. *United States v. Kozinski,* 16 F.3d

795, 810 (7th Cir.1994). In addition, "the sentencing judge should state reasons why each individual defendant was aware or reasonably foresaw the particular amount of drugs for which he will be held accountable, with reference to supportive evidence." *United States v. Goines,* 988 F.2d 750, 775 (7th Cir.), *cert. denied,* 510 U.S. 887, 114 S.Ct. 241, 126 L.Ed.2d 195 (1993); *United States v. Medina,* 992 F.2d at 591. A trial court's determination of the quantity of drugs used to compute a defendant's sentence is a finding of fact which will not be disturbed unless clearly erroneous. *United States v. Lloyd,* 10 F.3d at 1218.

In the present case, the presentence investigation reports calculated the amounts of cocaine attributable to each defendant, using one of two methods depending on the role of each respective defendant: (1) focusing on the amount of cocaine transported from Florida to Tennessee during the relevant time period the defendant participated in the conspiracy; or (2) focusing on the amount of cocaine distributed solely at Austin Homes during the relevant time period. The district court analyzed the time period that each defendant respectively participated in the conspiracy, the role each defendant played in the scope of the conspiracy, and made specific findings of fact with regard to the amounts of cocaine foreseeable to each defendant. These amounts were not always the same, which indicates that the district court's findings were unique to each defendant.

 We believe that this was a responsible method for determining the amount of cocaine in such a widespread conspiracy. It is appropriate for the district court to estimate a quantity of drugs for sentencing purposes based upon the testimony of the average amount of drugs distributed per day multiplied by the number of days in which the defendant participated in the conspiracy if these figures are reliable, and the average amount sold per day was reasonably foreseeable. *See United States v. Clemons,* 999 F.2d 154, 156 (6th Cir.1993), *cert. denied,* 510 U.S. 1050, 114 S.Ct. 704, 126 L.Ed.2d 671 (1994). The district court need not find the quantity of drugs for sentencing purposes down to a precise figure,

but may approximate the quantity of drugs within a specific range. *See United States v. Sanchez,* 928 F.2d 1450, 1460 (6th Cir.1991) (district court's finding that the amount of cocaine fell within a range of 5 to 14.9 kilograms was affirmed); *United States v. Nelson,* 922 F.2d 311, 316 (6th Cir.1990) (district court's finding that the defendant was responsible for between 500 grams and 2 kilograms of cocaine was upheld), *cert. denied,* 499 U.S. 981, 111 S.Ct. 1635, 113 L.Ed.2d 731 (1991). Finally, district courts may approximate the quantity of drugs for sentencing purposes based upon circumstantial evidence, *United States v. Stephenson,* 924 F.2d 753, 764–65 (8th Cir.), *cert. denied,* 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991), as long as they err on the side of caution. *United States v. Walton,* 908 F.2d 1289, 1302 (6th Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990).

██ We believe that the district court in the present case did not err in calculating the quantity of drugs. We find the district court's determination that the total amount of cocaine involved in the conspiracy was between 15 and 50 kilograms of cocaine is supported by a preponderance of the evidence and errs on the side of caution. For example, coconspirator Anthony Kelly testified that in a single year, 1988, he supplied one kilogram of cocaine per month to defendant Jones for a period of approximately 13 to 14 months. Coconspirator Leroy Adderly testified he purchased a kilogram of cocaine from Jones on three separate occasions in 1988 and 1989. Codefendant Nathan Watson testified that he brought cocaine from Florida seven to ten times in 1987 and 1988, transporting between 5 to 10 kilograms of cocaine. Coconspirator Jesse Anthony testified he traveled between Macon and Knoxville on about five separate occasions to acquire cocaine in Macon to be sold in Knoxville. He transported approximately 17 ounces for distribution between the fall of 1986 and January 1987. There was also testimony that cocaine was transported from Florida every month to month and a half in 1989 in the amounts of anywhere from nine ounces to three kilograms.

Numerous witnesses testified that they sold cocaine at College Homes or Austin Homes on a daily basis and that drugs were sold from about noon to midnight. In a recorded conversation on September 14, 1991, Jones indicated he was making $200,-000 in a month and a half from his sale of cocaine. A recorded conversation on December 3, 1991, confirmed that defendant Miller acquired multiple quantities of cocaine from the Florida Boys organization. Coconspirator testimony indicated that there were numerous salespersons, lookouts, and transporters involved in the conspiracy. There was testimony that defendant Jones and codefendant Watson bagged at least three $500–packages of quails for sale each day; that if all three bags were sold, then more cocaine would be acquired; and that as much as $10,000 worth of cocaine was sold during a weekend or on a big football game day. The scope of the conspiracy was also demonstrated by the evidence provided through various witnesses about the numerous rental car and van records, by the recorded telephone conversations, beeper records, pen registers, and by the Western Union wire money transfer records. A total of $19,700 was paid for rental vehicles, and between 1989 and 1991, 96 wire transfers totaling $107,175 were made.

In regard to defendant Jones, the district court made a finding of fact that he was responsible for between 15 and 50 kilograms of cocaine, and that he was a member of the conspiracy from 1988 until the time of his arrest in March 1993. As previously discussed, there was sufficient evidence indicating that Jones was involved with this amount of cocaine. For example, there was extensive testimony about the multiple kilograms of cocaine supplied to Jones by Anthony Kelly or others from Florida and about cocaine transported from Georgia; there was testimony about the wide scope of the organization in which Jones employed numerous managers or "lieutenants," who directed the daily activities of the many subordinates who sold cocaine or served as lookouts at College Homes and Austin Homes; there was testimony about the amount of money that was used to acquire cocaine during this timeframe and about wire transfers of the drug

proceeds. The wire transfer records, recorded telephone conversations, and business records previously discussed also indicate that by a preponderance of the evidence, Jones was the organizer of a conspiracy involving over 15 kilograms of cocaine.

The court found that defendant Andrews was involved in the conspiracy from the fall of 1988 through October 1992, and that testimony indicated Andrews was a lieutenant in the Florida Boys organization, was a prime mover of drugs from Florida to Knoxville, and possessed pipe bombs and guns during the conspiracy to protect the drugs. There was sufficient evidence indicating that defendant Andrews continued to assist in the transportation of cocaine from Florida to Knoxville after Anthony Kelly's arrest in 1989, that he was aware of the sources of cocaine in Florida, that he knew the wholesale and retail prices of cocaine, and that from 15 to 50 kilograms were reasonably foreseeable to him. For example, there was evidence that Andrews cosigned the lease for apartments at Concepts 21 beginning in 1989, frequently paid the rent for these apartments with drug proceeds, and was frequently seen there where the cocaine was stored and divided for distribution. We believe it was a conservative estimate that 15 to 50 kilograms was reasonably foreseeable to him.

The district court found that defendant Fletcher was a member of the conspiracy from 1989 and remained in it until March 1993. There was sufficient evidence that defendant Fletcher pooled his money to acquire cocaine from Jones in Florida for redistribution in Knoxville, that he traveled to Florida to acquire the cocaine, and that by a preponderance of the evidence, the amount of cocaine attributable to defendant Fletcher was between 15 and 50 kilograms. Specifically, Toby McClellan testified that defendant Fletcher received approximately one kilogram of cocaine per Florida trip, once or twice a month from defendant Jones between 1989 and 1991. This testimony was also corroborated by the testimony of his girlfriend, Sandra Scruggs, coconspirator Davis, informant Deborah Allen, and defendant Andrews' October 10, 1991 recorded conversation.

The district court limited the time frame that defendant Kelly was in the conspiracy from September 1990 to March 1992. The court determined that since Kelly was involved in wire transfers and was active in the transfer of cocaine and collection of money at Austin Homes and Concepts 21, it was reasonably foreseeable to him that at least nine kilograms of cocaine were distributed in the criminal activity in which he jointly participated. The district court limited the amount of cocaine for which he was held accountable to one-half kilogram of cocaine per month, even though the court believed a more accurate amount of cocaine was one kilogram per month based on the evidence.

We believe these findings cannot be said to be clearly erroneous. The evidence demonstrated that defendant Kelly transported cocaine from Florida to Tennessee, on occasion collected the proceeds of drug sales from workers at Austin Homes, and on at least one occasion sold cocaine at Austin Homes, stayed at Concepts 21 where cocaine was received, stored, bagged and sold, and received $17,750 in wire transfers in Florida from coconspirators in Knoxville. The evidence also demonstrated he was involved in the conspiracy as early as July 24, 1990 when he received a $1,000 wire transfer in Florida from Louis Cannamore in Knoxville, and that he remained in it until at least March 1992.

The district court found that the amount of cocaine attributable to defendant Jackson, Jr. was between 15 and 50 kilograms. The district court disregarded the evidence concerning the break-in to the truck at the impound lot, but found that defendant Jackson, Jr. knew or should have known that this amount of cocaine was sold during his three-year participation in the conspiracy from 1989—March 1993. The presentence report calculated that the quantity of cocaine sold at Austin Homes during this time period was 19 grams-per-day, resulting in a range between 15 and 50 kilograms of cocaine.

We find this amount is supported by a preponderance of the evidence. Codefendant Davis testified that from '87 to '89 about $2,000 to $3,000 worth of cocaine was sold per day at Austin Homes, six days a week, and that lookouts, such as Jackson, Jr.,

watched the one person who was doing the selling and therefore observed how much business the seller was doing.[6] Although the evidence does not indicate that Jackson, Jr. knew the exact amounts sold each day, it indicates that he was aware or reasonably should have been aware of the high level of activity at Austin Homes and that cocaine was sold regularly every day. Moreover, Louis Cannamore testified that Jackson, Jr. started selling cocaine himself in '90–'91, an activity which enhanced his exposure to the scope of the conspiracy. We believe that there was sufficient evidence to indicate that defendant Jackson, Jr. joined the conspiracy in 1989 and remained until 1993; that he was employed as a lookout for others selling cocaine at Austin Homes; that he sold cocaine at Austin Homes; and that based on these activities, it was reasonably foreseeable to him that 19 grams per day were being sold at Austin Homes. Therefore, there is sufficient evidence as to the amount of cocaine in regard to defendant Jackson, Jr.

The district court found that defendant Jackson, Sr. was a member of the conspiracy for at least a three-year period from 1989 until March 1993 and that the amount of cocaine attributed to him was between 15 and 50 kilograms. We believe this was supported by sufficient evidence. At the sentencing hearing, the United States supplemented the trial record with the testimony of Special Agent Poag concerning his surveillance of defendant Jackson, Sr.'s apartment, the use of his apartment in 1992, and his arrest in 1993 in this apartment. Trial testimony reflected continued use through 1992 of defendant Jackson, Sr.'s apartment by coconspirators, including coconspirator Cannamore, whom Agent Poag observed taking two pistols from a vehicle, placing them in a gym bag, and taking them into defendant Jackson, Sr.'s apartment. We believe that the district court fairly attributed only the cocaine which was sold at Austin Homes to defendant Jackson, Sr. and did not attribute to him addition-

al quantities of cocaine, which were being sold by others involved in the conspiracy outside of Austin Homes. The evidence indicated that defendant Jackson, Sr. was employed as a lookout for others selling cocaine at Austin Homes from approximately 1989 to 1993, that he allowed his apartment to be used as a meeting place for the Florida Boys organization, and that he was paid on a weekly basis. For the same reasons as stated in regard to Jackson, Jr., we believe it was reasonably foreseeable to defendant Jackson, Sr. that on the average, 19 grams of cocaine were being sold per day, an amount which correctly placed him in a range of between 15 and 50 kilograms of cocaine.

To conclude, each defendant was held accountable only for that amount of cocaine with which he was actually involved or which was distributed by coconspirators in furtherance of the execution of the jointly undertaken criminal activity which was reasonably foreseeable to each respective defendant. The district court's findings of fact as to the amount of drugs for which each defendant was accountable was supported by a preponderance of the evidence and was not clearly erroneous.[7]

## VI. Transcripts of Tape–Recorded Conversations

Defendants argue that the district court erred in admitting transcripts of 50 tape-recorded conversations into evidence. They contend that while some of the conversations were clearly audible, others were unintelligible to the listener and would not have been understandable except for the transcripts which accompanied the tapes.

Review of decisions to admit transcripts is under an abuse of discretion standard. *United States v. West*, 948 F.2d 1042, 1044 (6th Cir.1991), *cert. denied*, 502 U.S. 1109, 112 S.Ct. 1209, 117 L.Ed.2d 447 (1992). In the present case, the district

---

**6.** The record indicates that only one member of the Florida Boys sold drugs each day, and that the lookouts were instructed to watch that person and warn him about the police.

**7.** Defendants' argument that the district court erred in failing to use a "special verdict" form

for the jury, allowing the jury to determine the amount of cocaine for which each defendant was responsible, has been rejected by this court in *United States v. Todd*, 920 F.2d 399, 407–08 (6th Cir.1990).

**1130**

court followed the guidelines provided by this court in *United States v. Robinson*, 707 F.2d 872, 876–78 (6th Cir.1983) and set forth a schedule allowing defense counsel to review the tapes and transcripts and to file objections concerning accuracy. No objections were made. Before playing the tapes, the district court advised the jury that the transcripts were not evidence, but were being provided to the jury only as a guide to help them follow what was being said on the tapes. The court emphasized the tapes were the evidence, and if the jury noticed any discrepancies, they were to rely on the tapes and disregard the transcripts. He repeated this instruction in his final charge to the jury. The district court did not abuse its discretion in allowing transcripts to be used as aids to the jury when listening to tape recorded conversations in light of his limiting instructions. Once admitted, transcripts may be used by the jury during the playing of tape recordings at trial and during jury deliberations after the case has been submitted. *See United States v. West*, 948 F.2d at 1044.

VII. *Exposure to Prejudicial Information*

 Defendants argue that there was unauthorized exposure of prejudicial, extraneous information to the jury in regard to defendant Thomas Elder because an exhibit list presented to them contained a reference to a newspaper article about the apartment fire allegedly set by Elder on December 6, 1992, which killed four infants. However, the newspaper article itself was never sent to the jury room; only an exhibit list was sent. Among the hundreds of items listed on page 14 of the exhibit list was a reference which read: "10–21–93 ... newspaper article— deaths...."

On March 24, 1994, the district court held a hearing about the list of allegedly prejudicial exhibits and questioned each of the twelve jurors who deliberated in the case. Six of the twelve jurors indicated that they neither saw the exhibit list, nor did any other juror mention the exhibit list to them. Of the remaining six jurors who had seen the exhibit list, none had seen the "identification only" entry concerning the 10–21–93 newspaper article. The district court conducted this hearing pursuant to the provisions of Fed. R.Evid. 606(b), which provides for an inquiry into the validity of a verdict or indictment.

We find that the district court properly followed the dictates of Rule 606(b) and inquired into whether extraneous prejudicial information in regard to defendant Thomas Elder was improperly brought to the jury's attention. We agree with the court's determination that there was no evidence to contradict the jurors' testimony that they were not exposed to this entry and were not influenced by it. The district court is affirmed on this issue.

 Defendants also contend that the district court erred in denying a request to allow counsel to review the jurors' notebooks to make sure that the jury was not exposed to this extraneous information regarding defendant Elder and the deaths of four children. They contend that instead of questioning the jury pursuant to Rule 606, the court should have allowed defense lawyers to examine the jurors' notebooks for the purpose of determining whether or not any information regarding the deaths of four children by arson had been placed before them. The United States opposed the request to examine the notebooks because of the likelihood that portions of the deliberations, including the jurors' thought processes, comments, or calculations would be contained in these notebooks and that a review of these notebooks would be a violation of Rule 606(b).

Rule 606(b) specifically prohibits seeking a statement by the juror concerning a matter about which the juror would be precluded from testifying. If the juror's thought processes, comments, or calculations are written in juror notebooks, then the notebooks cannot be made available for inspection. *See United States v. Sanders*, 962 F.2d 660, 673 (7th Cir.), *cert. denied*, 506 U.S. 892, 113 S.Ct. 262, 121 L.Ed.2d 192 (1992). In light of this restriction of Rule 606(b), the district court properly refused the motion to have access to the jurors' notebooks. The district court is affirmed on this issue.

 Defendants also contend that the district court abused its discretion in failing to sequester the jury in a highly publicized

trial. In *United States v. Metzger*, 778 F.2d 1195, 1209 (6th Cir.1985), *cert. denied*, 477 U.S. 906, 106 S.Ct. 3279, 91 L.Ed.2d 568 (1986), this court held "where a jury has been clearly admonished not to read newspaper accounts of the trial in which they are serving as jurors, it is not to be presumed that they violated that admonition." In the present case, the district court daily cautioned the jury not to discuss the case with anyone, not to read or listen to any news stories or articles, not to listen to any radio or television reports about the case or about anyone who had anything to do with the case. Defendants have not shown that the jury failed to follow the court's instructions or were exposed to any extraneous prejudicial information, including pretrial or mid-trial publicity. For these reasons, the district court did not abuse its discretion in failing to sequester the jury.

■ Defendants also argue that they were prejudiced because of excessive security personnel in the courtroom. They contend that they were tried in a courtroom constantly full of security personnel, which identified them as dangerous individuals, and that as a result, they were denied a fair trial because a person accused of a crime is generally entitled to the physical indicia of innocence. *Kennedy v. Cardwell*, 487 F.2d 101, 104 (6th Cir.1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974).

We do not believe this argument has any merit. In *Holbrook v. Flynn*, 475 U.S. 560, 568–69, 106 S.Ct. 1340, 1345–46, 89 L.Ed.2d 525 (1986), the Supreme Court concluded that the conspicuous deployment of security personnel in the courtroom during trial is not the sort of inherent prejudicial practice that, "like shackling," should be permitted only where justified by an essential state interest specific to each trial. In order to establish prejudice, the defendant must demonstrate either that the alleged misconduct was inherently prejudicial or caused actual prejudice. *Id.* at 572, 106 S.Ct. at 1347–48.

In the present case, we do not believe that security personnel were inherently prejudicial to defendants. The Deputy United States Marshals were dressed in plain clothes and placed so as not to be conspicuous. Moreover, they were spread around the courtroom with some at the exits and others seated behind the defendants. There was no evidence that any of the security personnel displayed firearms or that any of the defendants were shackled or handcuffed in front of the jury. Also, there was no evidence that the jury was in any way aware of or influenced by the additional security personnel. Because defendants have not been able to show any inherent or actual prejudice, the district court is affirmed on this issue.

To conclude, defendants' arguments concerning exposure to prejudicial information or actions have no merit, and the district court is affirmed in regard to these issues.

## VIII. *Coconspirator Hearsay Testimony*

Defendants claim that the district court improperly admitted coconspirator hearsay testimony without making a finding by a preponderance of the evidence that a conspiracy existed, that the defendants against whom the statements were admitted were participants, and that the statements were made during and in furtherance of the conspiracy, which is required by Fed.R.Evid. 801(d)(2)(E); *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). Contrary to this argument, the district court made the appropriate findings as indicated by Vol. XIV of the trial transcript. The district court is affirmed on this issue.[8]

We will now deal with the fact-specific issues raised by the individual defendants, except for defendants' argument concerning cumulative errors, which is addressed in section XII.

## IX. *Defendant Jones*

### A. *Cumulative Punishment*

■ Defendant Jones argues that it constitutes cumulative punishment to convict him for engaging in a continuing crimi-

---

8. Defendants also contend that the district court erred in refusing to include defendant Jones' proposed jury instruction on multiple conspira- cies. However, the district court did give a "multiple conspiracies" instruction. *See* Joint Appendix, pp. 2749–51.

nal enterprise offense and for conspiracy. This court held in *United States v. Mohwish,* 993 F.2d 123, 124 (6th Cir.1993) that a defendant cannot be subjected to cumulative punishment for both conspiracy and a CCE violation even if the conspiracy and CCE sentences run concurrently. The recent Supreme Court opinion of *Rutledge v. United States,* —— U.S. ——, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996) has affirmed this rule. In light of this rule, the district court in the present case vacated defendant Jones' conspiracy conviction subject to the right of the United States to move to reinstate it in the event the CCE conviction should at some point be overturned. The district court is affirmed.

### B. *Managerial Role*

 Pursuant to U.S.S.G. § 3B1.1, defendant Jones' sentence was enhanced four levels for being an organizer and leader of an organization involving five or more participants. He contends on appeal that the district court failed to make a finding as to the identity of the five individuals whom he organized, relying on this court's opinion in *United States v. Stubbs,* 11 F.3d 632, 641 (6th Cir.1993).

This argument has no merit. This court in *Stubbs* did not require a district court to identify the five persons whom the defendant organized, but merely required the identity of the five participants involved in the criminal activity. *Id.* Moreover, in *Stubbs,* the defendant had not been charged with conspiracy, as defendant Jones in the present case was charged. In *United States v. Richardson,* 949 F.2d 851, 859 (6th Cir.1991), this court held that where a trial judge also presides over the sentencing, it is not improper for him not to make specific references about why he classifies a defendant as a leader or organizer. In the present case, defendant Jones was convicted at trial along with six codefendants of the conspiracy count charged in the indictment, and there was sufficient evidence to indicate that he managed at a minimum five of these six codefendants.[9]

For these reasons, the district court is affirmed on this issue.

### C. *Forfeiture*

 Defendant Jones contends that the jury's verdict forfeiting his interest in a Mercedes–Benz, a Honda CRX, a Hyundai, a residence, and currency was not supported by the evidence because there was no proof that the property at issue had any connection to the cocaine allegedly bought and sold by defendant.

 We disagree. There was sufficient evidence connecting the property to the cocaine. First, the currency forfeited was money, which was used by informants to purchase cocaine, a total of $6,000 in all. In regard to the Mercedes–Benz, defendant Anthony Kelly purchased the car for Jones and registered it in his mother's name in 1988, when Kelly was supplying Jones with kilogram quantities of cocaine every month. Also, the informant Charles Beneby testified that defendant Jones tried to trade the Mercedes–Benz to him for quantities of cocaine. In regard to the Honda CRX, the evidence indicates that defendant Jones used this car both in Florida and Knoxville, Tennessee to conduct activities promoting his continuing criminal enterprise. Several coconspirators also testified that defendant Jones and his codefendants extensively used a 1990 Hyundai, which he purchased from defendant Angela Elder to conduct his continuing criminal enterprise. In regard to the forfeiture of the residence located at 421 N.E. 26th Avenue in Boynton Beach, Florida, which was deeded to his mother, coconspirator Davis testified that drug proceeds were transported to that house to conduct a continuing criminal enterprise, and that the house was where the money laundered proceeds were sent.

 In regard to defendant Jones' argument that these forfeitures were disproportionate in violation of the Eighth Amendment, the value of the cumulative assets forfeited did not equal the fines which could

9. The evidence indicated that defendant Fletcher merely had a buyer-seller relationship with Jones.

have been assessed. Therefore, it cannot be rationally suggested that the forfeitures were so grossly disproportionate to the crime that it constituted cruel and unusual punishment or an excessive fine. *See United ed States v. Smith,* 966 F.2d 1045, 1056 (6th Cir.1992). The district court is affirmed on this issue.

### D. *Motion to Suppress*

 On May 14, 1993, defendant Jones filed a motion to suppress evidence derived from the electronic surveillance of his mother's telephone, evidence which he contended was obtained in violation of the Fourth Amendment. *The motion was denied.* Defendant contends that the affidavit of Agent Garten, which was used to get a warrant for this surveillance, provided no evidence that Betty Jones and defendant Jones had other than a mother-son relationship, and there was nothing to indicate the telephone would be used illegally. Thus, he alleged, the application lacked probable cause.

We disagree with defendant Jones' argument. In regard to a wiretap application, the issue is whether the affidavit supplies sufficient information so that a judge can find probable cause that the telephone at issue is being used in an illegal operation. *United States v. Domme,* 753 F.2d 950, 953 (11th Cir.1985). Agent Garten's affidavit set forth that defendant Jones was engaged in drug trafficking for an extensive period of time, that he utilized his mother's residence for this purpose, and that he used the telephone to contact other drug dealers, who were specifically named. Therefore, we find that there was probable cause to believe a crime would be uncovered by the proposed wiretap. The district court is affirmed on this issue.

### E. *Enhancement for Possession of a Gun*

Defendant Jones argues that the district court erred in enhancing his sentence by two points pursuant to U.S.S.G. § 2D1.1 for possession of a dangerous weapon, arguing that a weapon on the premises alone does not permit an enhancement. *United States v. McGhee,* 882 F.2d 1095, 1099 (6th Cir.1989).

██ A district court's finding that a defendant possessed a firearm during a drug crime is a factual finding subject to the clearly erroneous standard of review. *United States v. Duncan,* 918 F.2d 647, 650 (6th Cir.1990), *cert. denied,* 500 U.S. 933, 111 S.Ct. 2055, 114 L.Ed.2d 461 (1991). In *Bailey v. United States,* —— U.S. ——, ——, 116 S.Ct. 501, 503, 133 L.Ed.2d 472 (1995), the Supreme Court found that for a conviction under 18 U.S.C. § 924(c)(1) for use of a firearm, the evidence had to show that the gun was actively employed. However, Guideline § 2D1.1(b)(1) requires enhancement only if a dangerous weapon was "possessed" and does not specify that the weapon must be "used." The Supreme Court in *Bailey* suggested that § 2D1.1(b)(1) was an enhancement tool for dealing with those who "mix guns and drugs," but whose conduct does not fall within the meaning of 18 U.S.C. § 924(c)(1), which requires that the defendant use (in the sense of actively employ) or carry the weapon in the commission of the offense. *Id.* at ——, 116 S.Ct. at 509. The Supreme Court took great pains in *Bailey* to limit its holding to convictions under 18 U.S.C. § 924(c)(1), and specifically indicated its holding did not apply to guideline enhancements for weapons possession. *Id.* Therefore, *Bailey* does not control the present analysis. *United States v. Betz,* 82 F.3d 205, 211 n. 3 (8th Cir.1996). *See also United States v. Hill,* 79 F.3d 1477, 1486 n. 4 (6th Cir.1996); *United States v. Pollard,* 72 F.3d 66, 68–69 (7th Cir.1995); *United States v. Castillo,* 77 F.3d 1480, 1499 n. 34 (5th Cir. 1996).

 We find that there is sufficient evidence that defendant Jones possessed a dangerous weapon within the meaning of § 2D1.1(b)(1). The commentary to § 1B1.1 at Application Note 1(d) defines dangerous weapon to include "an instrument capable of inflicting death or serious bodily injury." Application Note 3 to § 2D1.1 further provides that the adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.

In the present case, there was evidence that defendant Jones possessed a nine-mil-

limeter pistol and an AK–47 rifle at the Sutters Mill apartment which he shared with defendant Troutman during the course of the conspiracy. The evidence also demonstrated that at that apartment, defendant Jones stored cocaine and drug proceeds and bagged cocaine for resale. Furthermore, there was evidence defendant Jones used a baseball bat to assault codefendant Watson in April 1989 in Austin Homes in relation to an argument concerning cocaine. Additionally, the evidence indicated that pipe bombs and a shotgun were stored at the Concepts 21 apartment where defendant Jones stayed and where cocaine was stored and bagged for resale. The evidence also established that employees of defendant Jones regularly carried weapons in Austin Homes while distributing and conspiring to distribute cocaine. "The possession of a gun by one coconspirator is attributable to another coconspirator if such possession constitutes reasonably foreseeable conduct." *United States v. Chalkias,* 971 F.2d at 1217. We find that in light of this evidence, it was not clearly improbable that dangerous weapons were possessed in relation to the offenses for which defendant Jones was convicted. *United States v. Sanchez,* 928 F.2d 1450, 1460 (6th Cir.1991). The district court's finding is not clearly erroneous and is affirmed.[10]

## X. *Defendant Kelly*

Defendant Kelly contends that pursuant to U.S.S.G. § 3B1.2, he should be given a two-level decrease in his base offense level for being a minor participant. He argues that he was far less involved than his coconspirators and that he was less culpable than those who took an active part in acquiring, delivering, breaking down, and selling cocaine. He contends the only evidence the district court correctly considered was that he was involved with the wire transfers.

▮ It is well settled that a defendant has a burden of proving mitigating factors, such as a downward adjustment for being a minor participant, by a preponderance of the evidence. *United States v. White,* 985 F.2d

271, 274 (6th Cir.1993). A minor participant is one who has a role that is less culpable than most other participants, but whose role cannot be described as minimal. A trial court's factual finding in this regard may be set aside only if it is clearly erroneous. *Id.* In the present case, the evidence supports that defendant Kelly had a role in transporting cocaine from Florida to Tennessee, in collecting money from gang members of the Florida Boys organization, in selling cocaine at Austin Homes, and in sending and receiving wire transfers over Western Union in the amount of $24,300. We believe that these actions can hardly be considered minor. Thus, the district court's conclusion that Kelly was participating "actively in the transfer and collection of cocaine" was not clearly erroneous, and the district court is affirmed on this issue.

## XI. *Defendant Andrews*

### A. *Explanation of Recorded Conversations*

▮ Defendant Andrews argues that the district court improperly allowed witnesses who were participants in recorded conversations to explain the meaning of certain words and phrases spoken during the conversation. Specifically, Andrews' counsel objected to the questioning of Toby McClellan, who indicated that the person referred to as "Marvin Gaye" in a recorded conversation was defendant Andrews. This argument lacks merit. According to the court in *United States v. Graham,* 856 F.2d 756, 759 (6th Cir.1988), *cert. denied,* 489 U.S. 1022, 109 S.Ct. 1144, 103 L.Ed.2d 204 (1989), a government witness may testify in the form of an opinion as to his understanding of a defendant's statement. Also, in *United States v. Martin,* 920 F.2d 393, 397 (6th Cir.1990), this court held that the United States was free to ask an informant about the event described in a tape recording. The district court is affirmed on this issue.

### B. *Requested Entrapment Instruction*

Defendant Andrews made a specific jury instruction request on the issue of entrap-

---

**10.** Defendant cites no authority for his argument that the firearms enhancement of § 2D1.1 and enhancement for a managerial role pursuant to § 3B1.1 constitute double counting. We find this argument has no merit.

ment regarding the testimony of government witness Deborah Allen. He contends that Deborah Allen worked for the government as an informant for the Drug Enforcement Administration during 1991, and for her services, she was paid $9,725. He contends that in the course of her work, she initiated a romantic and sexual relationship with him and asked him to supply her with cocaine. Defendant Andrews argues that he responded to this inducement to supply Deborah Allen with cocaine and asserts he was therefore entitled to an instruction on entrapment.

 Defendant Andrews' argument is without merit because there was insufficient evidence to support such an instruction. A valid entrapment defense has two related elements: (1) government inducement of the crime; and (2) lack of predisposition on the part of the defendant to engage in the criminal conduct. *Mathews v. United States*, 485 U.S. 58, 62–63, 108 S.Ct. 883, 886–87, 99 L.Ed.2d 54 (1988); *United States v. Nelson*, 922 F.2d 311, 317 (6th Cir.1990), *cert. denied*, 499 U.S. 981, 111 S.Ct. 1635, 113 L.Ed.2d 731 (1991). In the present case, defendant Andrews is not able to show lack of predisposition. The first recorded conversation about the purchase of cocaine by informant Deborah Allen from defendant Andrews on October 10, 1991, reflects that their intimate relationship had not yet begun. Additional evidence indicates that defendant Andrews would not reduce the price of cocaine for informant Allen. Also, the record reflects that defendant Andrews had been involved in the transportation of cocaine from Florida to Tennessee, the sale of cocaine, and management of members of the Florida Boys gang long before he met defendant Allen. Moreover, defendant Andrews did not pursue an entrapment defense during the presentation of evidence during trial. Had he done so, the United States would have been entitled to offer into evidence copies of his two prior felony drug convictions from the state of Florida in the late 1980s. Since defendant Andrews failed to present evidence justifying an entrapment defense, he was not entitled to an entrapment instruction. The district court is affirmed on this issue.

## XII. *Cumulative Effect of Any Errors*

Defendants contend that the errors at trial, if insufficient alone, were cumulatively such as to necessitate a reversal of their convictions. In the present case, we have found no error. Therefore, this argument has no merit.

## XIII.

To conclude, we have carefully considered all other issues, arguments, and authorities not specifically addressed in this opinion, and after carefully examining the record, we find no error. Therefore, the decision of the district court is hereby **AFFIRMED**.